# CAMP v. BOYD.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 71.   Argued February 28, March 3, 5, 1913.—Decided June 9, 1913.

Parties in possession of land under titles from various sources and having the equitable, as well as the legal, title to a portion of it and the equitable, but not the legal, title to the remainder, may, under the circumstances of this case, properly invoke the aid of equity to restrain other parties from maintaining ejectment suits and to adjudicate the title to the entire tract in a single suit.

A court of equity ought to do justice completely and not by halves.

As a court of equity should prevent multiplicity of suits, it may, to this end, if obliged to take cognizance of a suit for any purpose retain it for all purposes even though required to determine purely legal rights otherwise beyond its authority.

While a term, such as "ground rents," used in a conveyance may not be the recognized equivalent of any legal estate in lands, the court may ascertain the recognized meaning given to it and resort to that as evidence of the intent of the parties using it and thus determine what effect ought in equity to be given to it.

The term "ground rents" as used in the deeds and proceedings involved in this case did not import merely the rents that were to accrue during the residue of a 99 year lease renewable forever, but included the reversion as well, it appearing that the entire beneficial interest of the owner of the ground rents and the reversion was undoubtedly the subject of the sale and within the contemplation of the buyer and seller.

Deeds made by a public officer in pursuance of a decree of the court which are defective in form by reason of a mistake made by such public officer will pass the title to the property intended to be conveyed, as harmful consequences should not fall upon purchasers, who, in reliance upon apparent regularity have paid their money for the property.

Equity regards that as done which ought to be done. It looks to the true intent and meaning, rather than to the form. It relieves of consequences of accident and mistake as well as fraud.

35 App. D. C. 159, affirmed.

THE facts, which involve the title, legal and equitable, to certain real estate in the City of Washington, District of Columbia, are stated in the opinion.

*Mr. Hugh T. Taggart*, with whom *Mr. Wm. E. Ambrose* was on the brief, for appellant.

*Mr. R. Ross Perry*, with whom *Mr. Wm. F. Mattingly*, *Mr. John B. Larner* and *Mr. R. Ross Perry, Jr.*, were on the brief, for appellees.

MR. JUSTICE PITNEY delivered the opinion of the court.

This is an appeal from a decree of the Court of Appeals of the District of Columbia, affirming a decree of the Supreme Court, establishing the title of the complainants, (now appellees) to a lot of land in the City of Washington, and granting a perpetual injunction against the further prosecution of an action of ejectment that was brought by the appellant, Joseph Parker Camp, against Caleb C. Willard, the devisor of the complainants, to recover possession; and also enjoining Camp and all persons claiming under him from instituting any further proceedings at law or in equity for the possession of, or for asserting any claim to, the land. The cause was heard in the Supreme Court upon a demurrer to the bill of complaint, which was overruled (37 Wash. Law Rep. 14); and the defendant having elected to stand upon his demurrer, a final decree followed as of course. The decision of the Court of Appeals is reported 38 Wash. Law Rep. 374; 35 App. D. C. 159.

Both parties claim under Samuel Blodget, Jr., who owned the property in the early days of the Federal Capital. The bill of complaint sets forth the full history of the title, with copies of the instruments of conveyance and other documents necessary to a complete under-

standing of the controversy. All the facts hereinafter
stated respecting the title are derived from the averments
of the bill and from the documents filed with it and by
reference made parts of it.

The property in question is described as—"Original lot
numbered Twenty, in Square numbered two hundred and
fifty four, in the City of Washington, in the District of
Columbia, as the same is laid down on the ground plan or
map of said city." This square is bounded by E and F
Streets, and by 13th and 14th Streets, in the Northwest
section; Lot No. 20 being on the southerly side of F
Street.

Under the act of Congress entitled—"An act for estab-
lishing the temporary and permanent seat of the Govern-
ment of the United States," passed July 16, 1790 (1 Stat.
130, c. 28), three Commissioners were appointed by
President Washington, and they in the following year
made a friendly agreement with the original land-holders,
which resulted in laying out the city in squares and streets,
and the subdivision of the squares; and, in the year 1792,
a partition of the lands was made between the original
proprietors and the Commissioners. In that division this
lot was amongst those set off to the Commissioners, and it,
with some adjoining lots, was sold by them to Blodget in
the same year. But no conveyance was made to him, and
he therefore acquired only an equitable interest.

Blodget about that time organized a lottery under the
sanction of the Commissioners, and advertised it as done
"By the Commissioners appointed to prepare the public
buildings, &c., within the City of Washington for the re-
ception of Congress, and for the permanent residence after
the year 1800." It was announced as "A lottery for the
improvement of the Federal City." It was stated that
the sole design of the lottery was to facilitate other im-
provements together with the public buildings. The
capital prize announced was—"One superb hotel, with

baths, outhouses, etc., etc., to cost fifty thousand dollars,"
with cash prizes aggregating $300,000 in addition. The
advertisement stated that "The keys of the hotel, when
complete, will be delivered to the fortunate possessor of
the ticket drawn against its number," and that "One
hundred dollars will be given for the best plan of an elegant
and convenient hotel or inn, with hot and cold baths,
stable," etc. The advertisement was subscribed "S. Blod-
get, Agent for the Affairs of the City." Large sales of
tickets having been made by Blodget, and by Colonel
William Deakins, Jr., who appears to have been his part-
ner in the scheme, and some time having elapsed without
a drawing being made, the Commissioners became uneasy
because of their real or supposed responsibility for the
prizes, whereupon Blodget and Deakins gave them a
written declaration under seal, dated September 20, 1793,
agreeing to indemnify the Commissioners from all claims
and demands by reason of any prize to be drawn. After-
wards, and at the request of the Commissioners, Blodget,
who appears to have been a large land owner in the Dis-
trict, made a mortgage or deed of trust, under date of
January 28, 1794, to Thomas Johnson, Jr., and Thomas
Peter, as Trustees, for securing the payment of the prizes
and for the indemnity of Thomas Johnson, David Steuart,
and Daniel Carroll, the Commissioners, their successors,
etc. By the mortgage, Blodget transferred in fee to
Thomas Johnson, Jr., and Thomas Peter—"all the lands
and real estate and property of him the said Samuel
Blodget situate and being within the Territory of Colum-
bia, with their . . . appurtenances, and all the estate,
right, title, etc., in law and in equity" of Blodget therein.
The defeasance clause provided that Blodget should "pay
all prizes and sums of money with which he is or may be
chargeable, or for which he may be liable for or on account
of the said lottery, and shall in all things save, indemnify
and keep harmless the said Thomas Johnson, David

Steuart and Daniel Carroll, their successors, etc., against all suits," etc.

Thereafter, and in the year 1801, Blodget made three leases of as many several parcels of Lot 20. The lot has a frontage of 51 feet 11 inches upon the southerly side of F. Street, and a depth of 159 feet running to an alley. One lease was dated April 13, 1801, and demised to James Daugherty the easterly portion of the whole lot, having a frontage of 20 feet upon the street, and running the full depth to the alley; the second lease was to Edward Frethy, dated April 14, 1801, and covered the westerly portion of the lot, having a frontage of 19 feet 11½ inches and running of that width to the alley; the third lease, covering the intervening portion of the whole lot, having a frontage of 11 feet 11 inches on the street, and running the full depth, was dated April 15, 1801, and made to Edward Fennell. The Daugherty and Frethy leases were recorded within the year. The Fennell lease, for some reason, was not promptly acknowledged or recorded, and therefore a new lease was made by Blodget to Fennell, dated April 20, 1804, and recorded a few days later. These leases all ran for ninety-nine years from their respective dates in 1801, the terms, however, "to be renewable forever." They were sealed instruments, elaborate in form, signed and acknowledged by lessor and lessee in each instance, and recorded in the Land Records of the District of Columbia. A copy of the Daugherty lease is set forth in the margin.[1]

---

[1] [COPY OF LEASE—SAMUEL BLODGET TO JAMES DAUGHERTY.]

This indenture made the thirteenth day of April in the year of our Lord one thousand eight hundred and one Between Samuel Blodget of Philadelphia State of Pennsylvania of the one part and James Daugherty of the City of Washington in the Territory of Columbia of the other part witnesseth that the said Samuel Blodget for and in consideration of the payment of the rent and performance of the Covenants hereinafter mentioned on the part of the said James Daugherty his executors administrators and assigns to be paid and performed Hath

The Frethy lease was substantially like it. The Fennell lease of April 20, 1804, contained a recital of the previous lease to him and the failure to record it, and the making

demised granted leased and to farm lett and by these presents Doth demise grant lease and to farm lett unto the said James Daugherty his executors administrators and assigns. All that Lott of twenty feet front on F Street in Lott number twenty in square number two hundred and fifty four in the City of Washington aforesaid Together with all improvements, alleys, ways water & water courses privileges, easements and emoluments belonging or appertaining to said Lott. To have and to hold said lott of ground with the appurtenances unto the said James Daugherty his executors administrators and assigns from this the thirteenth day of April above mentioned for and during and unto the full term of Ninety nine years from thence next ensuing and fully to be compleated and ended yielding and paying therefor yearly and every year during said term unto the said Samuel Blodget his heirs and assigns the yearly rent or sum—forty dollars current money of the United States free and clear of all taxes assessments or public dues nor or hereafter to be laid taxe- or assessed on sd. demised premises in annual payments on the said thirteenth day of April in each and every year—the said term of ninety nine years to be renewable forever. Provided always and it is the true intent and meaning of these presents that if it shall happen that if the said yearly rent shall be in arrear and unpaid by the space of forty days next after the time on which the same is above reserved to be paid, then it shall and may be lawful to and for the said Samuel Blodget his heirs or assigns unto the said demised premises or any part thereof in the name of the whole to re-enter and the same to have again repossess occupy and enjoy as in his or their former estate until all such arrearages of rent with legal interest thereof and all and every cost charge and expenses incurred by the said Samuel Blodget his heirs or assigns by reason of the non-payment of said rent shall be fully satisfied and paid or make distress therefor at his or their option and also if the said yearly rent Shall be in arrear and unpaid by the space of sixty days next after the time on which the same is above reserved to be paid then it may be lawful to and for the said Samuel Blodget his heirs and assigns unto the said demised premises or any part thereof in the name of the whole to re-enter and the same to have again repossess occupy and enjoy as in his or their former estate and that then in such case this Indenture and every clause matter and thing therein contained shall from henceforth be utterly void and of no effect and the said James Daugherty for himself his executors adminis-

of the present instrument in the place of it; the demise then proceeded in substantially the same form as in the other leases.

The Daugherty lease reserved a yearly rent of $40

trators and assigns doth covenant and agree to and with the said Samuel Blodget his heirs and assigns well and truly to pay the above reserved yearly rent or sum of forty dollars at the time before within mentioned and also that he the said James Daugherty his executors administrators and assigns shall and will erect and build a good and substantial dwelling house to be compleated and tenantable in the course of the present year at farthest which if not complied with he the said James Daugherty binds himself his heirs executors and administrators to satisfy and pay unto the said Samuel Blodget his heirs and assigns the damages which shall or may accrue to him or them for such compliance and moreover in case *of* a defalcation shall be made in payment of the rent as above mentioned then and in such case the improvements which shall be made on the above demised premises shall belong unto the said Samuel Blodget his heirs and assigns—and the said Samuel Blodget for himself his heirs and assigns doth covenant promise and agree to and with the said James Daugherty his heirs executors administrators and assigns that he the said James Daugherty his heirs or assigns at any time or times during the continuances of this present or future demise on the request and at the proper costs and charges of the said James Daugherty his heirs, or assigns and on his or their payment or tending in payment to the said Samuel Blodget his heirs or assigns the principal sum of five hundred dollars shall and will make and execute a deed in fee simple for said Lo*tt* and premises above demised to the said James Daugherty his heirs and assigns forever with such clause of General Warrant*ee* as he or they may require. It is further agreed that the said James Daugherty his heirs or assigns may pay unto the said Samuel Blodget his heirs or assigns any proportion of the principal of five hundred dollars not less than one tenth of that sum and so much of the principal as shall be paid so much in proportion of the rent shall be lessened reserving unto the said Blodget his heirs or assigns all penalties and forf-itures within before mentioned until the whole sum of five hundred dollars, is paid when the whole rent shall cease. In witness whereof the said parties have hereunto interchangeably set their hands and seals the day and year first above written.

SAM BLODGET.     [SEAL.]
JAMES DAUGHERTY.  [SEAL.]

Signed, sealed and delivered, etc.

payable annually, with an option of purchase in fee at the price of $500; the Frethy lease was the same in these respects; the Fennell lease called for a rent of $24 per annum and a purchase price of $300. The leases were alike in that they provided for terms of 99 years each, with a right of perpetual renewals; with right of reëntry by the lessor for 40 days' default in payment of the rent, or distress at his option; two of them provided that for 60 days' default in the payment of the rent the lessor might reënter and terminate the lease; each lease contained an option for a purchase in fee at a price of which the annual rent was equivalent to 8%; each required the lessee to erect a dwelling house upon the premises during the year of the making of the lease. The Fennell lease differed in containing no provision for forfeiture of the term on non-payment of the rent, and in some minor particulars.

In October, 1802, one Robert S. Bickley began suit against Samuel Blodget and others by bill in Chancery in the Circuit Court for the District of Columbia, setting up the history of the above-mentioned lottery; the public advertisement of the scheme; that Bickley, in reliance upon the proposed plan, purchased a ticket; and that the sale and disposal of the tickets was intrusted wholly to Blodget and to William Deakins, Jr., since deceased. The bill set out the making of the indemnity agreement of September 20, 1793, by Blodget and Deakins, and the making of the mortgage by Blodget on January 28, 1794, to Thomas Johnson, Jr. (since deceased), and Thomas Peter (still surviving), covering all the lands of Blodget within the Territory of Columbia. That he, Bickley, drew as a prize the "Superb Hotel with baths, outhouses, &c., &c., to cost fifty thousand dollars," as offered and promised in the advertisement, plan and scheme; "that the said hotel has never been finished and the keys thereof delivered to your orator as by the said scheme and plan of the lottery he was assured and promised it should be."

That in the year 1798 he, Bickley, instituted a suit at law in the Supreme Court of the Commonwealth of Pennsylvania, against Blodget, to recover damages by reason of his breach of undertaking; that this suit being at issue, and a jury impanelled to try the issue joined therein, it was mutually agreed between Bickley and Blodget, with the leave of the court, that the jury should be discharged from giving their verdict, and should be empowered to act as referees, to determine and order what sum of money, if any, should be paid by Blodget to Bickley, and if they thought proper, to order titles and conveyances and other acts by either party to the other as justice should require; whereupon the jury as referees awarded that Blodget should convey to Bickley, in fee simple, the hotel and the lots of ground belonging to it, and should also pay to Bickley the sum of $21,500 with costs, for the payment of which, and the performance of the award, the property in the City of Washington mortgaged by Blodget to the Commissioners was by the terms of the award to be first resorted to; that upon the report of the jury as referees the court gave judgment in favor of Bickley against Blodget, for said sum of $21,500 and costs, and that the report of the jury as referees should be in all its other parts confirmed and carried into full and complete execution. That by virtue of the deed of trust of January 28, 1794, all the real property which Blodget had within the limits of the Territory of Columbia was pledged and made answerable to make good to the fortunate adventurers the prizes they should draw in the lottery, and "that your orator has his claim to be paid out of that property still further confirmed by the award and the judgment hereinbefore set forth." The bill then set forth that the "lands and real estate and property" of Blodget situate within the Territory of Columbia "as well in law as in equity, as by the said deed is expressed, consisted of," etc., following with a detailed enumeration of many tracts and parcels

of land, among which is—"the following property which the said Blodget purchased of the said Commissioners at the times hereinafter mentioned, which being fully paid for by the said Blodget, certificates in due form have regularly issued therefor, but the Commissioners meaning to hold the same as security to themselves and to the fortunate adventurers in the said lottery, have not delivered the same to the said Blodget or caused them to be recorded, but whilst they remained in office held the same, and when they went out of office the same fell into the hands of Thomas Munroe, Superintendent of City Affairs, who now holds them, that is to say, Lots numbered twenty and twenty-one in square 254 in the said City, sold to the said Blodget on the 8th day of October, 1792," etc., etc. The bill specified by lot and square numbers those lots that had been appropriated by Blodget for the hotel, averring that the legal title to some of them was in Munroe, Superintendent for City Affairs, certain of them having been conveyed by Blodget to the Commissioners, others having remained in their ownership, and the legal title to the remainder being in Blodget. Sundry deeds of conveyance made by Blodget to various purchasers for portions of the lands covered by the deed of trust were then set forth. In this connection the leases made by Blodget to Daugherty and Frethy, respectively, in April, 1801, for parcels of lot No. 20 in Square 254, were set out, and these lessees were made parties defendant. The Fennell lease was not mentioned, apparently because it was not upon record at the time of the filing of the bill. The prayer was, that Blodget might be required to convey to Bickley the hotel with the lots pertaining thereto; that Munroe as Superintendent of the City should be compelled to convey to Bickley that portion of the lots pertaining to the hotel of which he held the certificates; and that the residue of the property set forth in the bill of complaint, or so much thereof as necessary, should be sold

to pay the money adjudged to Bickley by the award and judgment in the Pennsylvania suit.

Annexed to this bill of complaint as exhibits were copies of the deed of trust of January 28, 1794, a transcript of the proceedings in the Pennsylvania suit, and other documents sustaining and supplementing the averments of the bill. Among the parties named as defendants were Blodget, Thomas Munroe, Superintendent for City Affairs, Frethy, Daugherty, and other grantees of Blodget. Frethy was served with process and filed an answer setting up that he had assigned his lease to one Betz. Daugherty being a non-resident, notice appears to have been published against him. Blodget answered, admitting in part and denying in part the averments of the bill. Annexed to the answer was a formal admission of "the execution of the various exhibits at this time filed by complainant, and that they may be read in evidence." Thomas Munroe, as Superintendent of the City of Washington, filed an answer admitting the principal averments of the bill and setting up that he, as Superintendent, had in his hands the certificates of sale evidencing Blodget's purchases of various lots from the former Commissioners; that the Commissioners had withheld the certificates from Blodget's possession "as security for the fortunate adventurers in the said lottery who should have claims against the said Blodget." Lot 20 in Square 254 does not appear among the lots enumerated in this connection. Thomas Peter, the surviving trustee under the mortgage or deed of trust of January 28, 1794, does not appear among the parties named as defendants in the original bill filed by Bickley, but he filed an answer admitting the execution of that deed, and that it was made at the instance of the then Commissioners of the City of Washington to secure the punctual payment of the prizes drawn in the lottery therein mentioned; and—"That this defendant knows not what property is included or compre-

hended by the said deed, but this defendant further answering admits that whatever property he does hold in virtue of the said deed is held by him in trust for the purposes in the said deed mentioned and subject to any order or decree which this Honorable Court shall make respecting the same." Thereafter, Peter seems to have been treated as a party defendant. On September 24, 1804, a written stipulation was filed in the cause, signed by the respective solicitors for complainant and for the defendant Blodget, in the following terms: "It is agreed by the complainants and the defendants in this cause, by their solicitors, that a decree shall pass immediately by consent for conveying to the complainant the hotel and the lots appropriated for the same. That the execution and truth of all the exhibits referred to in and by the complainants is hereby admitted, all form as to the *of* (*sic*) proceeding waived. This admission in no wise to give validity or authenticity to the award obtained in the court of Pennsylvania or the judgment thereon rendered, but that is to stand on its own merits unaffected by this agreement. This cause set down by consent for hearing at the next term." An interlocutory decree was made accordingly, under date October 1, 1804, requiring Blodget and Thomas Peter to convey to Bickley, Lot 1 in Square 430, with the buildings and improvements thereon, and requiring Munroe, as Superintendent, to convey and assure to Bickley Lots 1, 2, 3, 4, and 5 in that square; and retaining the cause as to all other property and as to all other objects and purposes mentioned in the bill. October 4, 1805, a further decree was made, requiring the defendant Blodget to pay to the complainant, Bickley, on or before a date in November, the amount of the debt due to him, being the sum of $26,635.13, besides costs, and decreeing that on failure thereof certain designated sections and lots of ground, situate in the City of Washington, or so much thereof as should be sufficient

to raise and pay the said several sums of money, should be sold, and it was further decreed "that certain ground rents reserved by the said defendant Blodget, by indenture made between the said Blodget, of the one part, and Edward Frithey, one of the defendants, of the other part, bearing date on the 4th day of April 1801, and certain other ground rents reserved by the said Samuel Blodget by indenture made between the said Samuel Blodget of the one part, and James Daugherty, one of the said defendants, of the other part, bearing date on the 13th day of April, 1801, be also sold for the purposes aforesaid." Daniel Carroll Brent was appointed trustee for making the sale. He was directed to sell the property at public auction, after advertisement, report the sale to the court, and upon confirmation of it, and payment of the purchase money, "the said trustee by a deed or deeds good and operative in law, etc., shall give, grant, bargain and sell, release and confirm to the respective purchasers and their heirs respectively all the right, title and interest therein which was or is in the said Samuel Blodget, and all the right, title or interest therein which the said Thomas Peter derived in and thereto by virtue of the deed in the said bill of complaint mentioned (referring to the deed of trust of January 28, 1794)  . . .. and the purchaser or purchasers respectively, and their respective heirs, shall thereupon hold the same by them respectively purchased free, clear and discharged from all claims of the said Samuel Blodget and of the other defendants." It was further decreed that the defendant Thomas Peter, upon the request of the trustee, should join and become a party in and to all deeds to be executed by the trustee in virtue of this decree; and that in all cases where the outstanding legal title remained in Thomas Munroe as Superintendent, he, Munroe, should at the request of the trustee, join in and become a party to the deed. "And lastly, as to all the property in the said bill of complaint mentioned,

and as to all the objects of the said bill not in and by this decree specially and particularly decreed upon, this cause is retained for further proceedings hereafter to be had thereupon, and for that purpose is ordered to be continued."

Brent accepted the appointment as trustee, gave bond, and, after advertisement, made a public sale of the property. The notices, after describing many tracts of land by lot and square numbers, contained the following: "Also several certain ground rents reserved by said Blodget, amounting in the whole to eighty dollars per annum." His report of sale was made under date of January 21, 1806. It mentions "Ground Rent on James Daugherty's lease" as sold to Henry Pratt for $360, and "Ground Rent on Edward Frithy's lease" as sold to Robert F. Howe for $400. No mention is made of the remainder of Lot 20 in Square 254, nor of the ground rent on the Fennell lease. By decree made under date June 25, 1806, the report was approved and the sales confirmed (with an exception not now material), and it was ordered that the proceeds of sale, after paying expenses, taxes, etc., be paid over to complainant towards the discharge of the moneys theretofore decreed to be due from the defendant Blodget to him. It further appears that the purchases made by Pratt (including the Daugherty ground rent) were made for the benefit of Bickley, the complainant; and Pratt assigned his bids to Bickley, October 31, 1806. Brent reported this to the court and asked for leave to make deeds for the Pratt purchases to Bickley, and the court accordingly made an order that Brent, together with Thomas Peter and Thomas Munroe, should convey to Bickley all the property purchased by Pratt at the sale.

Pursuant to these proceedings, Brent, Trustee, Thomas Peter, and Thomas Munroe, Superintendent, etc., joined in a deed dated April 3, 1807, to Bickley, reciting the decree of October 4, 1805, ordering among other things

"that sundry squares, lots and portions of ground and ground rents in the said City of Washington" be sold, reciting the advertisement and sale made in pursuance thereof, and that at the sale certain lots particularly mentioned "And the ground rent reserved by the said Samuel Blodget by Indenture made between him and James Daugherty, one of the defendants, bearing date on the 13th day of April, 1801," were sold to Pratt; the assignment of Pratt's bid to Bickley, etc. Brent as trustee thereby conveyed "all the right, title and interest of, in, and to the before mentioned squares, lots and portions of ground and ground rents in the City of Washington aforesaid which was in the said Samuel Blodget. Peter conveyed all his right, title and interest under the mortgage or deed of trust of January 28, 1794; and Munroe joined in conveying certain of the lands described in the deed, but not the "ground rents" in question.

By indenture dated January 15, 1807, Daniel C. Brent, Trustee, and Thomas Peter conveyed to Robert F. Howe the property purchased by the latter at the trustee's sale. The deed recites the decree, and the sale made thereunder, and that "among other property and ground rent so set up and exposed to sale was the ground rent reserved by the said Blodget by Indenture made between him and the said Edward Frethy, one of the defendants, bearing date on the fourth day of April, 1801, when the said Robert F. Howe being the highest bidder therefor became the purchaser thereof at and for the sum of four hundred dollars," and in consideration thereof, conveyance is made to Howe of "all the right, title and interest of, in and to, the said ground rent, reserved by the said Samuel Blodget by Indenture made between him and the said Edward Frethy, dated on the fourth day of April, 1801, as aforesaid, which was in the said Samuel Blodget, previous to and at the time of making the said decree, and all the right, title and interest therein which

the said Thomas Peter derived in and thereto, by virtue of the deed referred to in the said decree to have been given by the said Samuel Blodget to the said Thomas Peter and Thomas Johnson, Jr., since deceased, bearing date on the twenty-eighth day of January, 1794," etc.

On May 28, 1810, a supplemental bill was filed, reciting that the sale made by Brent had fallen short of paying the money decreed to be due to Bickley, and that he had lately discovered other property not included in the former bill and decree, consisting of sundry lots particularly described, and—"That the said Samuel Blodget was also on the said 28th day of January, in the year 1794, seised and possessed of and entitled to sundry lots in the said City, which he afterwards let on ground rent, reserving an annual rent for the said property, to divers persons hereinafter particularly set forth, which tenants your petitioner does not wish to disturb or interfere with, but wishes to leave them in the quiet enjoyment of their leases under the said Blodget, under the terms and conditions expressed in the said leases respectively, but wishes and prays of this court to direct the ground rents reserved thereon, and the reversionary interests of the said Blodget therein, whatsoever the same may be, to be sold for the benefit of your petitioner, which lots so leased on ground rent are as follows, to wit, eleven feet, eleven inches more or less fronting on F Street, North, extending in depth one hundred and fifty-nine feet to an alley, being part of Lot No. 20 in Square No. 254, leased to a certain Edward Fennell, his Executor &c., for a term of years renewable from time to time forever, reserving the quarterly rent of twenty four dollars payable to the said Blodget." Several other like leases are mentioned, and this averment follows—"To all of which ground rents the said Blodget now claims title, and is in the actual receipt thereof." The prayer was for a sale of the property thus mentioned, to raise the balance due to complainant.

Blodget answered, admitting the facts stated in the supplemental bill, with an exception not now material, and stating that he had no objection to a decree as prayed. A decree was made accordingly, under date November 5, 1813, and Washington Boyd was appointed trustee to make the sale. Some years later he made a report of sale in writing, and afterwards represented to the court that in consequence of ill- health he would be required to leave the District for some time, and requested the court to appoint some other person to make conveyances, suggesting John Davidson for this purpose. The court appointed Davidson accordingly.

By indenture dated May 8, 1818, Davidson, as such Trustee, conveyed to Charles Glover, in consideration of $405.50, "all the interest claim and right of the said Samuel Blodget" in certain lots sold by Boyd as Trustee, pursuant to the decree of November 5, 1813, and, among others, "part of Lot twenty, in square two hundred and fifty four, fronting eleven feet eleven inches on north F Street, leased to Edward Tennell (sic) for ninety nine years, renewable forever, under the annual ground rent of twenty four dollars."

This completes the recital of the proceedings in the Chancery suit of Robert S. Bickley against Samuel Blodget and others, and of the sales and conveyances made pursuant to the decrees therein, so far as they pertain to the interest of Blodget in the land now in controversy. We proceed to a statement of the subsequent transfers, so far as necessary for a determination of the questions presented.

By indenture dated May 1, 1813, Bickley, in consideration of $400, conveyed to James Daugherty, his heirs and assigns, "all that part of Lot No. 20 in Square No. 254, fronting on F Street North, twenty feet" which was leased by Blodget to Daugherty. The deed mentions the date of the lease, and recites that "all the estate, interest and claim of the said Samuel Blodget in and to the said part

of a lot and premises, was afterwards sold and conveyed by Daniel C. Brent as trustee, under a decree of the said Circuit Court of the District of Columbia for the County of Washington to the said Robert S. Bickley." This deed contained a covenant of general warranty.

Assuming the above-mentioned deed from Brent, Trustee, and others to Bickley had the effect to vest in Bickley all the reversion that was in Blodget, subject to the Daugherty lease, this deed from Bickley to Daugherty brought about a merger of the leasehold and the reversion.

By mesne conveyances, all of Daugherty's interest came to be vested in one Benjamin F. Isherwood in the year 1852.

As already pointed out, the ground rents under the Frethy lease were conveyed by Brent, Trustee, and Thomas Peter, by deed dated January 15, 1807, to Robert F. Howe. It appears that Frethy had assigned his lease to one Frederick Betz, by recorded deed, dated September 19, 1801; Frederick Betz assigned it to George Betz by recorded deed of January 24, 1803; and George Betz assigned it to John Thorp by recorded deed of February 15, 1804. Each of these instruments transferred all right and interest of the assignor in the land, describing it by measurements and abuttals, and referring to the lease thereof made by Blodget to Frethy for "ninety-nine years, renewable forever."

It is admitted that William Dowling probably succeeded to the ownership of this leasehold by an unrecorded assignment of Thorp's interest. Dowling claimed in a deed made by him to Robert F. Howe, presently to be mentioned, that he was the owner of the leasehold interest.

In 1830 the corporation of the City of Washington made a tax deed to Dowling for "Part of Lot 20 and the improvements in Square 254" for unpaid taxes assessed against it "as the property and in the name of Robert F. Howe," for the years 1819 to 1824, inclusive. Dowling

by a deed made in 1831, reciting this tax title, conveyed to Howe and his heirs "all the right, title, interest, and estate of him, the said William Dowling," in the part of the lot conveyed to him by the tax deed, "except the leasehold right belonging to him in the same," the deed declaring it to be the intention of the parties "that the said William is not to surrender his leasehold interest in the said part of lot and premises." Robert F. Howe, by his will, dated in 1830, authorized his executors to sell all his estate for the purpose of paying certain legacies, and thereafter his executors, by deed dated in 1835, conveyed this plot to William Dowling, the deed reciting that Robert F. Howe "held under a deed of conveyance to him from Daniel C. Brent, Trustee, and Thomas Peter, made the fifteenth day of January, in the year of our Lord 1807," and that at the time of the making of that deed the property "was subject to a lease for ninety-nine years, renewable forever," as will appear "by reference to an indenture of lease dated April fourth, 1801, and recorded," etc.

Under the will of William Dowling, and by mesne conveyances thereafter, whatever estate Dowling had in this parcel became vested in Benjamin F. Isherwood in the year 1865.

As already pointed out, the ground rents of the Fennell lease—for the word *Tennell* in the deed is obviously a mistake—became vested in Charles Glover; but that deed likewise included "all the interest, claim and right" of Blodget in that part of Lot 20 that was covered by the Fennell lease; thus evidently conveying the reversion. The bill avers that this part of Lot 20 was conveyed by Abraham Bradley's heirs to Benjamin F. Isherwood in 1852. It does not appear when or how (if at all) Fennell's leasehold became merged in the reversion. Nor does it seem to be material, for if not merged, it lapsed on the expiration of the 99-year term and failure to renew, and this

before the ejectment suit was commenced. Respecting this parcel, the contention of appellant is, that the bill of complaint of the appellees shows no reason for equitable relief, because, if they have the title they claim to have, it is a sufficient title to constitute a good defense to an action at law.

Whatever interests Benjamin F. Isherwood may have acquired by the above-mentioned conveyances in the several portions of Lot 20 admittedly became vested in Caleb C. Willard, the devisor of the appellees, in or about the year 1882.

On the other hand, whatever reversionary rights (if any) remained in Samuel Blodget have admittedly become vested in the appellant.

The bill of complaint herein avers that the defendant, now appellant, claims to be the assignee of the heirs-at-law of Blodget; and that he claims that after the execution of the leases there remained in Blodget and his heirs a reversion in fee in Lot 20; that only a rent-charge passed under the proceedings in *Bickley* v. *Blodget;* that as the leases have expired without purchase or renewal by the lessees the reversion has come into possession, and that therefore as plaintiff in ejectment he has the right to recover possession and title in fee simple.

These contentions are in fact made here in behalf of the appellant with respect to so much of Lot 20 as was leased to Daugherty and to Frethy respectively.

As to the Fennell lot, it is insisted that by the very language of the supplemental bill in the Bickley suit, and the decrée for sale made pursuant to it, and the terms of the deed made by Davidson, Trustee, thereunder, the purchaser acquired a legal title to the reversion, and not merely to the ground-rents; and that therefore, on the theory that the averments of the bill are true, the appellees have an absolute fee simple title to the Fennell lot, such as to constitute a plain, adequate and complete defense

to the ejectment suit. And it is pointed out that under
the local practice (Code D. C., §§ 993, 1000) defendants
may separately defend as to that parcel.

The question for decision, therefore, is whether the
appellees have a good title as against the appellant; and,
if so, whether the nature of their title is such as to render
it unavailable at law and to require the intervention of a
court of equity for their relief against appellant's claims.

It is suggested, rather than urged, as a ground of equi-
table jurisdiction, that because Blodget never received a
deed of conveyance from the Commissioners for Lot 20
in Square 254, his title was never more than an equitable
title; and that since both parties claim under him, the
controversy is a matter proper for the cognizance of a
court of equity, whatever be the grounds of controversy
as between the parties. We doubt whether this view is
tenable. There is no question that Blodget, and those
claiming under him, have openly asserted title to the prop-
erty, at least from the year 1801 down to the present time;
and while the bill herein contains no averments respecting
possession, it may be assumed that, for a long time at
least, possession has followed the title. Assuming Blodget
and those inheriting from him, and under whom appellant
claims, were equitably entitled to the reversion, subject
only to the ninety-nine year terms, any possession of the
lessees has been, as against the outside world, the posses-
sion of the appellant and his predecessors in title. There-
fore it is more than probable that any legal title remaining
in the Commissioners has become barred by long posses-
sion. Besides, it might perhaps, after 120 years, be pre-
sumed at law, as well as in equity, that the Commissioners
had made a deed or deeds to Blodget that had since been
lost. And, since both parties to the present controversy
claim under Blodget, and would probably in an action of
ejectment be required to trace title no further back than
the common source, it is better, we think, to lay aside for

present purposes the theory that the equitable jurisdiction in this action can be supported upon the ground that Blodget derived only an equitable title from the Commissioners.

This brings us to the real controversy, which is the effect of the proceedings and decree in the Bickley suit, and the deeds made thereunder by Brent, Trustee; to the purchasers of the "ground-rents."

For present purposes, we may accede to the contention of appellant that the bill of complaint herein shows, with respect to the parcel that was covered by the Fennell lease, the title to which passed under the supplemental bill and decree in the Bickley suit, that the effect of the proceedings, and the language of the decree, and of the deed made by Davidson, Trustee, thereunder, was such as to pass to the purchaser a legal title to the reversion.

Assuming this, however, it does not follow that the appellees, if they have the *equitable as well as the legal title to the Fennell parcel,* and if at the same time they have the *equitable but not the legal title to the Daugherty and Frethy parcels,* may not properly invoke the aid of equity against the ejectment suit. If the appellant had limited his action at law to the Fennell parcel, his contention that if the Willard title to that parcel is good at all, it is as good at law as in equity, and therefore available as a defense in the ejectment suit, would demand consideration.

But appellant brought the action of ejectment for an entire lot made up of three parcels, of which the Fennell plot lies between the other two. The appellees, if driven to invoke the aid of equity against that action because they had an equitable and not a legal title to the Daugherty and Frethy parcels, were fairly entitled to bring the entire controversy into the court of equity, so that it might be adjudicated in a single suit.

A court of equity ought to do justice completely, and not by halves. *Decker* v. *Caskey,* 1 N. J. Eq. 427, 433;

*Williams* v. *Winans*, 22 N. J. Eq. 573, 577; *Knight* v. *Knight*, 2 Eq. Cas. Abr. 169, pl. 25; *S. C.*, 24 Eng. Rep. 1088, 1089; Story Eq. Pl., §§ 72, 174.

One of the duties of such a court is to prevent a multiplicity of suits, and to this end a court of equity, if obliged to take cognizance of a cause for any purpose, will ordinarily retain it for all purposes, even though this requires it to determine purely legal rights that otherwise would not be within the range of its authority. *Oelrichs* v. *Spain*, 15 Wall. 211, 228; *Holland* v. *Challen*, 110 U. S. 15; *Reynes* v. *Dumont*, 130 U. S. 354, 395; *Kilbourn* v. *Sunderland*, 130 U. S. 505, 514; *Gormley* v. *Clark*, 134 U. S. 338, 349. And since there is no question that the equitable title of appellees to the Fennell lot is good, if their equitable title to the Daugherty and Frethy lots is good, we may proceed at once to the question of the effect of the proceedings and decree in the Bickley suit, and the deeds made thereunder, as bearing upon these two lots.

In strictness of law, the deeds made by Brent, Trustee, purporting to convey the "ground rents" on the Daugherty and Frethy leases cannot be deemed to have included the reversion. The rule at law is, that by a grant of the reversion the rent reserved will pass; but that by a grant of the rent the reversion will not pass. "The incident, accessary, appendant, and regardant, shall in most cases pass by the grant of the principal, without the words *cum pertinentiis*, but not *é converso;* for the principal doth not pass by the grant of the incident, &c. *Accessorium non ducit, sed sequitur, suum principale.*" Shepp. Touch. 89. And see Co. Litt. 152a; Broom. Leg. Max. (7th ed.), 491, 493.

The contention of appellant is that the term "ground rents," as employed in the decree of the court in the case of *Bickley* v. *Blodget*, has a plain and clear meaning, ascertainable without recourse to outside evidence; and it is insisted that the rents referred to were limited to the

terms of ninety-nine years, because the only rents mentioned in the leases are the annual rents reserved by Blodget in each demise, to be paid during the respective terms of ninety-nine years, and which therefore would cease with the expiration of the term.

The argument elaborates the legal status of the lessor and lessee under the leases. It is said that the import of the contract is plain; that a lease for a specific and definite term of ninety-nine years, and no longer, was created; and that an option was given in connection therewith to the respective lessees and their successors in interest for other and further terms of similar duration, and also an option for the purchase of the demised premises during the terms created or any future term. And it is insisted that the leases extended only until the expiration of their respective terms, and did not, *proprio vigore*, extend or continue such terms for a definite or indefinite period; that the options made the existence of new leases in the future possible, but not certain; that the creation of future leases depended wholly on the exercise of the privilege of a renewal by each lessee or his successor in interest; and that the privilege not having been exercised in either instance, all rights of the lessees expired at the end of ninety-nine years.

All this may be assumed, as matter of law, without advancing us far towards the solution of the real question presented. If the appellant is entitled to the reversion, the question whether the appellees or their predecessors in title have lost the right of renewal or purchase by failure to exercise the option, and whether equity will relieve them by decreeing a renewal on proper terms, may require consideration.

But the question must first be answered whether, in the sight of equity, the appellant is entitled to the reversion. The appellees, besides showing a title to the leasehold interests of Daugherty and Frethy, respectively claim

to have acquired also the reversion in fee that remained in Blodget; and this they claim under the decree in the Bickley suit, and the deeds made thereunder, in which the interest was denominated "ground rents." Now, while we cannot say that this term is the recognized equivalent of any legal estate in lands, it is clear that as a descriptive term it has, and had at the time of the proceedings under consideration, some recognized meaning that may be resorted to as evidence of the intent of the parties, and from which may be determined what effect ought in equity to be given to the proceedings and decree in the Bickley suit.

In *Bosley* v. *Bosley's Exrs.* (1852), 14 How. 390, 396, this court (by Mr. Chief Justice Taney) said, with respect to a somewhat similar lease made by a resident of the City of Baltimore for lands in Baltimore County:

"In the case before us, the interest which the testator had in this land at the time of making his will, was converted into money by his contract with Armstrong. It was a sale and an agreement to convey his whole interest in the land. It is, therefore, unlike the case of a lease for years, or of ninety-nine years, renewable forever, in which the lessor retains the reversion, and does not bind himself to convey it on any terms to the lessee. The form of the contract adopted in this instance, between the testator and Armstrong, is in familiar use in the sale of lots in the city of Baltimore and the adjacent country. It has nearly, if not altogether superseded the old forms of contract, where the vendor conveyed the lands, and took a mortgage to secure the payment of the purchase money—or gave his bond for the conveyance, and retained the legal title in himself until the purchase money was paid. And it has taken the place of these forms of contract, because it is far more convenient, both to the seller and the purchaser. For it enables the vendee to postpone the payment of a large portion of the purchase money

until he finds it entirely convenient to pay it; and, at the same time, it is more advantageous to the vendor, as it gives him a better security for the punctual payment of the interest; and while an extended credit is given to the vendee, it is to the vendor a sale for cash. For if his ground rent is well secured, he can, at any time, sell it in the market for the balance of the purchase money left in the hands of the vendee. It will be observed that the rent reserved is precisely the interest on the amount of the purchase money remaining unpaid."

That leases for ninety-nine years, renewable forever, were common in Maryland, and therefore presumably well understood in Washington at the time of the Bickley foreclosure, appears from *Banks* v. *Haskie* (1876), 45 Maryland, 207, 213, 217; *Myers* v. *Silljacks* (1882), 58 Maryland, 319, 330; *Ogle* v. *Reynolds* (1891), 75 Maryland, 145, 150; *Jones* v. *Rose*, 96 Maryland, 483, 484. It is contended that these cases, and especially *Banks* v. *Haskie*, show a departure from the principles that anciently obtained in that State, and that the contracts between Blodget and his lessees were made in view of the law as understood in the year 1801. We need not stop to discuss this, because we are dealing with the term "ground rents," not as a term of law, but as a term of description, and we cite the Maryland cases as historical authorities, irrespective of their authority as law.

The contention of the appellant that the term *ground rents* as used in the proceedings and deeds in question, imported, only the rents that were to accrue during the residue of the 99-year terms of the Daugherty and Frethy leases, respectively, will not bear analysis.

In the first place, it was of the essence of both leases, that the terms were "ninety-nine years, *renewable forever.*" The rent was to be the same for the extended terms as for the initial term of ninety-nine years. It certainly cannot have been within the contemplation of

the parties that the lessee or his assigns would not find it advantageous to renew at the end of ninety-nine years. The lessees were required to put substantial buildings upon the lots. And all the circumstances show that the parties contemplated that long before the expiration of the lease, the lands demised would be in the midst of a real, and not a "paper" city.

Moreover, the theory that it was intended to separate the right to the rentals until the year 1900 from the right to those that would accrue under renewals of the term, presupposes that the parties intended to separate the ground rents from the reversion. But such a separation is hardly conceivable. The only real security that the lessor had for the payment of the rents was the right reserved to him to enter and repossess the land until the arrearages were paid, or to terminate the lease should they not be paid. It is obvious that if the owner of the ground rents had no right to the estate upon the termination of the lease, his action in terminating it would benefit not himself, but the owner of the reversion. In short, this view would leave the payments to accrue during the residue of the ninety-nine years, no longer entitled to be designated as "ground rents." They would in effect stand as ordinary choses-in-action, resting for security upon the personal responsibility of the lessees, or their assignees in possession; subject to be rendered valueless by the insolvency of the lessee, or perhaps defeated, so far as the assignee's liability was concerned, by an assignment to a pauper. *Valliant* v. *Dodemede*, 2 Atk. 546; 26 Eng. Reprint, 728; *Lekeux* v. *Nash*, 2 Stra. 1221.

Nor is it reasonable to suppose that the parties intended to reserve in Blodget any estate in the lands, present or future. We say *the parties*, because in equity the decree, and the deed made thereunder, must, we think, be deemed to be the act of Blodget as well as of Bickley and the other parties to the cause.

The action was not, as it has been termed by counsel, a "creditor's suit." It was a foreclosure suit, brought to enforce the mortgage that Blodget had given for the purpose of securing to the fortunate holders of winning tickets in his much advertised lottery the prizes he had promised them. That all of Blodget's interest in the lands was pledged under the mortgage has already been stated; that he recognized his equitable obligation is evident from the record. In the common law action brought by Bickley against him in Philadelphia, he agreed that the jury might act as arbitrators not only with respect to the amount of money due from him to Bickley, but with respect to enforcing the award upon his land in the District of Columbia. When the foreclosure suit was commenced, he aided it by admissions, consents, and stipulations, showing himself in every way willing to forward the object aimed at by Bickley, namely, to subject the mortgaged property to the performance of his obligations arising out of the lottery scheme.

It was clearly the purpose to sell all the beneficial interest that Blodget had in the several plots in question, subject to the leases. This reserved interest was denominated "ground rents," (using a phrase evidently in popular use), without distinction as to their duration, and therefore presumably meaning that they should be perpetual, as well as the leases under which they were derived; but subject, of course, to commutation by the exercise of the lessee's option of purchase at an amount of which the annual rental was the equivalent of eight per centum.

The proceedings in the Bickley-Blodget suit show beyond cavil or question that it was the purpose not only of the parties to the action, but of the court, that all of Blodget's right, title and interest in Lot 20 should be sold towards paying the debt he owed to the complainant. The reservation of any interest in Blodget was inconsistent with

the very object of the suit. The reversion would be practically valueless for approximately ninety years; its then present purchase-value would be altogether insignificant. A purpose to reserve it in Blodget is not supposable. If it had been thought of as a substantial interest, separate from that described as "ground rents," it would have been mentioned, as it was mentioned, and in terms included, in the decree made on the supplemental bill. In no event would Blodget have been permitted to retain it.

Nor is there any room to doubt that bidders at the sale, including the successful bidders who became the purchasers, supposed that in buying the "ground rents" they were buying an investment security representing the substantial fruits, and the entire fruits, of ownership reserved by Blodget on the leases;—and not for mere terms of ninety nine years, but for such terms *"renewable forever."* That the interest of Blodget sold for its fair market value is beyond question, for otherwise the court would not have confirmed the sales.

After the sales were confirmed, only two things remained to be done in order to carry the decree of the court into effect so far as concerned the passing of title. One was—"The payment of the whole purchase money for the respective parts of the said property so sold;" the other was that "the said trustee by a deed or deeds good and operative in law, to be acknowledged, etc., shall give, grant, bargain and sell, release and confirm to the respective purchasers and their heirs respectively" the property sold; with Peter and Munroe joining, in order to make sure that no legal title should remain outstanding.

There is no doubt that the purchase price was paid; indeed, one of the purchasers in question was Bickley, the complainant, for whose benefit the sale was made. Such payment being made, the purchasers at once became the owners, in equity, of the reversionary interest of

Blodget. But the decree entitled them to the legal title.

And deeds of conveyance were made in order to carry out the decree. But one thing was lacking; the deeds were *not* "góod and operative in law," because, although they described well enough according to the common intent what was intended to be conveyed, they did not define it according to the legal formula. And so the form of the deeds was undoubtedly defective. This, upon all the evidence, was a mistake, pure and simple. And it was the mistake of a public officer. To say that when such a mistake occurs in carrying out the decree of a court of equity,—a court possessed of full jurisdiction over the subject-matter and all the parties—harmful consequences shall be permitted to fall upon the purchasers who, in reliance upon the apparent regularity of the proceedings, have paid the purchase-money to the officer of the court in the belief that they would get as good a title as the court could give them, and as good as the court could require any of the parties before it to give them,-- would be nothing less than a reproach upon the administration of justice.

The equitable principles upon which our decision must turn, are simple and fundamental. Equity regards that as done which ought to be done. It looks to the true intent and meaning, rather than to the form. It relieves against the consequences of accident and mistake, as well as of fraud.

In *Lytle* v. *State of Arkansas*, 9 How. 314, 333, this court (by Mr. Justice McLean) said: "It is a well established principle, that where an individual in the prosecution of a right does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him." In *Williams* v. *United States*, 138 U. S. 514, 517, the court (by Mr. Justice Brewer), said: "It cannot be doubted

that inadvertence and mistake are, equally with fraud and wrong, grounds for judicial interference to divest a title acquired thereby. This is equally true, in transactions between individuals, and in those between the government and its patentee. If, through inadvertence and mistake, a wrong description is placed in a deed by an individual, and property not intended to be conveyed is conveyed, can there be any doubt of the jurisdiction of a court of equity to interfere and restore to the party the title which he never intended to convey? So of any other inadvertence and mistake, vital in its nature, by which a title is conveyed when it ought not to have been conveyed." See, also, *Morrison* v. *Stalnaker*, 104 U. S. 213; *Ard* v. *Brandon*, 156 U. S. 537, 541; *Duluth & Iron Range R. Co.* v. *Roy*, 173 U. S. 587, 590.

In our opinion the averments of the bill herein, admitted by the demurrer, show that, with respect to the Daugherty and Frethy lots, the appellees have a good title in equity, but not at law, as against the appellant, and therefore are entitled to restrain him, and those claiming under him, from prosecuting an action of ejectment, or otherwise asserting title to those plots. And, with respect to the Fennell plot, the same result follows, for reasons above given, although appellees' title, besides being good in equity as against that of the appellant, is also good at law, and therefore might have been availed of as a legal defense.

*Decree affirmed.*