**STEPHENS et al. v. HOWELLS SALES CO., Inc., et al.**

(District Court, S. D. New York. December 15, 1926.)

**1. Copyrights ⊕⇒81—Owner of copyright is necessary party to infringement suit by licensee.**

Owner of copyright is necessary party plaintiff to suit by licensee for infringement of copyright under which he holds his license, since technically legal title remains in licensor.

**2. Courts ⊕⇒316—Licensee's payment to owner for joining as party plaintiff in copyright infringement suit held not collusion.**

Licensee's payment of certain sum to owner of copyright with agreement to hold him harmless for purpose of securing his participation as party plaintiff in suit for infringement of copyright *held* not to amount to collusion for purpose of acquiring jurisdiction.

**3. Affidavits ⊕⇒18—Mere ex parte affidavit held inadmissible.**

Mere ex parte affidavit *held* inadmissible as evidence.

**4. Depositions ⊕⇒98—Deposition of deceased witness, containing alleged admissions against interest, given on former trial, held admissible.**

Deposition consisting of testimony of witness on former trial, who has since died, and containing alleged admissions against interest, *held* admissible.

**5. Copyrights ⊕⇒55—Motion picture "Vendetta" held to infringe "Mr. Barnes of New York."**

Motion picture "Vendetta" *held* to constitute a copyright infringement of the book "Mr. Barnes of New York."

**6. Words and phrases —"Vendetta" is private blood feud, in which family seeks to avenge injury of one of members on offender or his family.**

A "vendetta" is a private blood feud, in which a family seeks to avenge one of its members on offender or his family.

**7. Copyrights ⊕⇒12—New treatment of old plot may be copyrighted.**

Although an old plot cannot be copyrighted, new treatment of old plot may be protected thereby.

**8. Copyrights ⊕⇒83—After proving appropriation of theme and characters, plaintiff need not show appropriation was not from public domain.**

Where plaintiff in copyright infringement suit had proved use of theme and characters in alleged infringement, it is not necessary to prove that appropriation was not from source in public domain.

**9. Copyrights ⊕⇒16—Treatment of subject is protected by copyright.**

It is not the subject, but treatment thereof, that is protected by copyright.

**10. Copyrights ⊕⇒33—Renewal of copyright held properly secured under provisions of Copyright Act later than that under which copyright was taken (Copyright Law July 8, 1870 [Rev. St. § 4954]; Copyright Act March 4, 1909, §§ 24, 63 [Comp. St. §§ 9545, 9584]).**

Copyright secured under Copyright Law July 8, 1870 (16 Stat. 198), *held* properly renewed under Copyright Act March 4, 1909 (35 Stat. 1075), since, under section 63 of latter act (Comp. St. § 9584), act of 1870 (Rev. St. § 4954), providing for renewals under such act, is repealed, as conflicting with section 24 of act of 1909 (Comp. St. § 9545).

**11. Statutes ⊕⇒219—Interpretation of copyright law by Copyright Office is entitled to consideration.**

Although interpretation of copyright law by Copyright Office is not final, it is entitled to great consideration.

**12. Copyrights ⊕⇒65—Right to dramatize book is part of existing copyright (Rev. St. § 4952, as amended by Act March 3, 1891, § 1 [26 Stat. 1106]).**

Under Rev. St. § 4952, as amended by Act March 3, 1891, § 1 (26 Stat. 1106), right to dramatize book became part of existing copyright therein.

**13. Copyrights ⊕⇒79—Defendants in copyright infringement suit held not entitled to determination of liability of codefendant under alleged warranty (equity rule 30).**

Under equity rule 30 defendants in copyright infringement suit are not entitled to determination of liability of one codefendant arising by virtue of alleged warranty in sale of motion picture rights alleged to constitute an infringement, since any damages thereunder give rise to action at law.

**14. Copyrights ⊕⇒79—Defendant may set up as counterclaim only such claims as are subject of independent suit in equity (equity rule 30).**

Under equity rule 30 defendant may set up as counterclaim only such claims as are subject of independent suit in equity, and interposing any claim relating to subject-matter of principal suit is not warranted.

In Equity. Suit by John F. Stephens and others, as executors of the last will and testa-

ment of John F. Stephens, deceased, and the Goldwyn Pictures Corporation against the Howells Sales Company, Inc., and others. Decree for plaintiffs.

Henry Staton, of New York City, for plaintiff Stephens.

Kelley & Becker, of New York City (Charles E. Kelley, of New York City, of counsel), for plaintiff Goldwyn Pictures Corporation.

Davies, Auerbach & Cornell, of New York City (Charles H. Tuttle and Carl E. Peterson, both of New York City, of counsel), for defendant Howells Sales Co.

William Klein, of New York City, for defendant Blumenthal.

Arthur W. Weil, of New York City, amicus curiæ.

GODDARD, District Judge. This is a suit to recover damages under the Copyright Act for infringement of the book "Mr. Barnes of New York" by the motion picture "Vendetta," imported and distributed by the defendants.

On March 8, 1887, the book "Mr. Barnes of New York" was copyrighted by Archibald Clavering Gunter, its author. In copyrighting the book the author "reserved the right to dramatize" under section 4952 of the Copyright Act of July 8, 1870 (Rev. Stat. U. S. § 4952), then in effect. Mr. Gunter died February 20, 1907, leaving a widow, Esther L. Gunter, to whom a renewal of the copyright was issued on October 7, 1914, pursuant to the Copyright Act of March 4, 1909, c. 320 (Comp. Stat. 1913, §§ 9517–9524, 9530–9584), extending the term of the copyright to March 8, 1943. Before obtaining the renewal she, as executrix and sole beneficiary under her husband's will, assigned the "moving picture rights" under the copyright to John F. Stephens, and after the renewal she assigned renewed copyright of the book to John F. Stephens. By various assignments, the "moving picture rights" under the copyright of the book were assigned by John F. Stephens to the plaintiff Goldwyn Pictures Corporation. There are no other outstanding assignments of copyright or rights under the copyright.

The author dramatized the book into a play of the same name, and the first public performance of it was on May 8, 1887, under the authority of the author, in New York City. The play was not copyrighted. The plaintiffs are the executors of John F. Stephens, the owner of the copyright of the book "Mr. Barnes of New York," and the Goldwyn Pictures Corporation, as the owner of the "moving picture rights," under that copy-

right; Stephens having died after the suit was at issue, and, awaiting trial, his executors were substituted in his place.

The negative of the motion picture "Vendetta" was brought into this country by the defendant Blumenthal on June 10, 1921, and was originally exhibited in New York late in 1922. Shortly thereafter an action was commenced by the Goldwyn Pictures Corporation against the defendants, all of which took a more or less active part in the exploitation of the motion picture.

[1, 2] There has already been considerable litigation over the matter now involved. In this present suit, the Goldwyn Pictures Corporation, hereafter referred to as Goldwyn, and Stephens are made plaintiffs in Goldwyn's effort to overcome the former defect of the absence of Stephens, the owner of the copyright, as a plaintiff, which is necessary because such a licensee cannot bring suit for infringement of the copyright under which he holds his license in his own name; this for the reason that the copyright is, technically speaking, indivisible, the legal title remaining in the licensor and the licensee having merely an equitable title. In order to induce Stephens to come in as a joint plaintiff, Goldwyn paid Stephens $2,500 and agreed to hold Stephens harmless from all expenses incidental to the litigation, and Stephens transferred to Goldwyn any rights it might have in damages recovered, and executed an irrevocable power of attorney authorizing him "to be joined as a party plaintiff or a party defendant in any legal proceedings now pending or which may hereafter be brought."

It is urged by defendants that this is collusive, and an improper scheme of the Goldwyn Pictures Corporation to create a semblance of jurisdiction, which otherwise did not exist, and contrary to the rule in Cashman v. Amador, etc., 118 U. S. 58, 6 S. Ct. 926, 30 L. Ed. 72. In Goldwyn Pictures Corporation et al. v. Howells Sales Co. (C. C. A.) 287 F. 100, Judge Hough refers unfavorably to the procuring of Stephens as a plaintiff, but makes no definite statement that the action should be dismissed on that ground. In the recent case of Independent Wireless Co. v. Radio Corporation, 269 U. S. 459, 46 S. Ct. 166, 70 L. Ed. 357, decided by the Supreme Court on January 11, 1926, Mr. Chief Justice Taft, in the unanimous opinion of the court, said:

"There is no express authority given to the licensee to use the name of the patent owner in equity, as we have seen that he can under section 4919 in suits at law. The pres-

ence of the patentee or his assignee in the equity suit, however, it has been held, is just as essential to obtaining an injunction or an accounting of profits or damages under the patent laws as it is in an action on the case for damages at law. Indeed, both the owner and the exclusive licensee are generally necessary parties in the action in equity. Waterman v. Mackenzie, 138 U. S. 252 [11 S. Ct. 334, 34 L. Ed. 923]; Littlefield v. Perry, 21 Wall. 205, 223 [22 L. Ed. 577]; Paper Bag Cases, 105 U. S. 766 [26 L. Ed. 959]; Birdsell v. Shaliol, 112 U. S. 485, 493 [5 S. Ct. 244, 28 L. Ed. 768]. * * *

"It seems clear, then, on principle and authority, that the owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer or to enjoin infringement of it. * * *

"We think the cases cited go beyond the defendant's interpretation of them, and do hold that, if there is no other way of securing justice to the exclusive licensee, the latter may make the owner without the jurisdiction a co-plaintiff without his consent in the bill against the infringer. Equity will not suffer a wrong without a remedy. 1 Pomeroy's Equity Jurisprudence (4th Ed.) §§ 423, 424. * * *

"The objection by the defendant that the name of the owner of the patent is used as a plaintiff in this suit without authority is met by the obligation the owner is under to allow the use of his name and title to protect all lawful exclusive licensees and sublicensees against infringers, and by the application of the maxim that equity regards that as done which ought to be done. Camp v. Boyd, 229 U. S. 530, 559 [33 S. Ct. 785, 57 L. Ed. 1317]; United States v. Colorado Anthracite Co., 225 U. S. 219, 223 [32 S. Ct. 617, 56 L. Ed. 1063]; Craig v. Leslie, 3 Wheat. 563, 578 [4 L. Ed. 460]. * * *"

Cashman v. Amador, etc., supra, and the other cases cited by defendants' counsel are instances where the plaintiffs, which were brought into the cases, had no real cause of action, were not necessary parties, and were brought in solely for the purpose of accomplishing indirectly a result which was contrary to the law. In Cashman v. Amador, supra, the relationship of trustee and cestui, between the person who brought the suit and the one who caused him to bring it, did not

exist; he was under no duty originally to bring suit. But in the case at bar Goldwyn, the licensee, can obtain no relief unless the owner of the copyright, Stephens, is a party to the action. Stephens' position was in the nature of that of a trustee, and was obligated to protect his "cestui que trust," or at least put him in a position to protect himself. But, upon Stephens' failure to do this, Goldwyn was confronted with a practical situation, and in an effort to obtain what he was rightly entitled to he paid Stephens $2,500 and agreed to hold him harmless. Goldwyn could have made Stephens a party plaintiff without Stephens' consent, and Stephens for his services as trustee was entitled to payment for his own services and for necessary disbursements for counsel fees, etc. Wehrenberg v. Seiferd, 125 App. Div. 527, 109 N. Y. S. 896; 39 Cyc. 482.

If a similar clause had been inserted in the original license agreement, and the licensee had found it necessary to sue an infringer to protect his rights, could it be said that such an arrangement was so collusive or champertous as to vitiate the suit thus instituted against the infringer? I would think not. Goldwyn did more for Stephens than it was legally required to do, but the history of this litigation shows convincingly that Goldwyn's purpose was only to secure prompt action to protect his own rights, which he felt were endangered. It seems to me that under the circumstances there is a distinction between this situation, where he is endeavoring to save rights which he had previously and properly obtained, and where new rights are bought for the purpose of bringing suit. Moreover, this is a court of equity, and, as I view it, the nature of Goldwyn's act was not such as should permit these defendants to escape from the consequences if they have infringed plaintiffs' rights, and that would be the practical result if this action was dismissed because of Goldwyn's payment to Stephens.

[3, 4] At the trial an affidavit of Esther L. Gunter, made March 16, 1922, and a deposition of John F. Stephens, were offered in evidence by plaintiffs' and defendants' counsel respectively, and received subject to examination by the court. Mrs. Gunter's affidavit is excluded, it being a mere ex parte statement. Stephens' deposition is received in evidence, as it is the testimony of a witness upon a former trial, who has since died, and it is an alleged admission against interest.

[5] The plot in the moving picture "Vendetta" is so strikingly like the book "Mr. Barnes of New York" in general plan and detail as to plainly lead one to conclude that they were

conceived by the same mind and that the picture infringes the book. There is a duel between an English naval officer and a Corsican (French) army officer; the Corsican is killed; his sister, the heroine, swears to avenge his death; she searches for the Englishman; she nurses in a hospital in Alexandria, Egypt, and there falls in love with her patient, an Englishman; they meet later in Monte Carlo; love conquers her oath of vengeance and they get married in Corsica. The villain, her guardian and suitor, tries to incite her to kill her husband in their bridal chamber, having got the apparent proof that it was he who killed her brother; she wavers, torn between the two passions of love and hatred; love again triumphs, whereupon the old Tomasso, the family servant, seizes the dagger and stabs through the curtains at, he thinks, the approaching bridegroom, but instead kills the villain, who had hidden there to see his rival killed. The scenes are laid in the same places —Ajaccio, Corsica, Alexandria, Egypt, Monte Carlo, and back to Corsica. The names of the principal characters are the same, with the exception that "Marina" becomes "Marianna" and "Mr. Barnes of New York" becomes "Gladwin Irving."

| In the Book. | In the Picture. |
| --- | --- |
| Marina Paoli. | Marianna Paoli. |
| Antonio Paoli. | Antonio Paoli. |
| Count Musso Danella. | Count Musso Danella. |
| Tomasso. | Tomasso. |

[6] Although the title of the book is "Mr. Barnes of New York," the whole subject-matter of the book is the vendetta. A vendetta is "a private blood feud, often hereditary, in which a family seeks to avenge an injury to or a murder of one of its members upon the offender or his family." Standard Dictionary. Therefore the title of the moving picture "Vendetta" is actually the subject-matter of the book.

[7] Without elaborating upon them, a comparison of the incidents, scenes, and passages of the book "Mr. Barnes of New York" and the motion picture "Vendetta" shows many of them to be identical, with some unimportant variations. It is also contended by the defendants that the book, "Mr. Barnes of New York," wherein it refers to the Corsican vendetta, was not original with Mr. Gunter, and so could not be copyrighted. It is true that an old plot could not be copyrighted, and this plot is old, but a new treatment of an old plot may be protected by copyright. Fred Fisher, Inc., v. Dillingham (D. C.) 298 F. 145. Probably almost every conceivable plot has been the subject of many books. However, people will continue to write books, and the public continue to read them, because of the new characters and settings with which the authors surround an old plot, and such of them as are the independent productions of the authors may be copyrighted. In Reed v. Carusi, Fed. Cas. No. 11,642, Chief Justice Taney says: "The copyright is prima facie evidence that he was the author, and the burden of proof is upon the defendant to show the contrary."

[8, 9] There have doubtless been many books which have the "vendetta" as their basis or theme. Counsel for the defendants refer to Balzac's "Vendetta" and Merimee's "Colomba"; but an examination of their characters, plots, and events demonstrates that they are quite different from those in "Mr. Barnes of New York." It is not the subject that is protected by copyright; it is the treatment of a subject that is protected. Gunter has created new characters, scenes, and events. In the present instance the defendants have taken, not only the old theme, but they have used Gunter's new characters, scenes, and sequence of events; they have not copied any common original, which they had a right to do, but they have copied the plaintiffs' copyrighted book, which they were not free to do. Bleistein v. Donaldson, 188 U. S. 239, 23 S. Ct. 298, 47 L. Ed. 460.

Where such facts have been shown as have been by the plaintiffs, they do not have the further burden of proving that defendants' motion picture was not appropriated from some source in the public domain. This would place the plaintiffs in the position of proving a negative, which would be quite an impossible burden, and one which is not imposed upon a plaintiff in a copyright case. Werner v. Encyclopædia Britannica Co. (C. C. A.) 134 F. 832. In O'Neil v. General Film Co., 171 App. Div. 854, 157 N. Y. S. 1028, the court held that it was significant that the defendant did not show from what source he had obtained the materials for his moving picture.

[10] The defendants urge that plaintiffs' original copyright, having been secured under the Copyright Act of July 8, 1870 (16 Stat. 198), could only be renewed under the provisions of that act and its amendments, and that as it was renewed, or was attempted to be renewed, under the Copyright Act of March 4, 1909 (35 Stat. 1075), there never was a valid renewal of the copyright of the book "Mr. Barnes of New York." More specifically presented, the question is "whether the act of 1909 repeals that portion of the act of 1870 which required subsequent publication for four weeks of the renewal in one or more newspapers in the United States?"

Section 24 of the 1909 act (Comp. St. § 9545) reads:

"Sec. 24—The copyright subsisting in any work at the time when this act goes into effect may, at the expiration of the term provided for under existing law, be renewed and extended by the author of such work if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then by the author's executors, or in the absence of a will, his next of kin, for a further period such that the entire term shall be equal to that secured by this act, including the renewal period: Provided, however, that if the work be a composite work upon which copyright was originally secured by the proprietor thereof, then such proprietor shall be entitled to the privilege of renewal and extension granted under this section: Provided, that application for such renewal and extension shall be made to the copyright · office and duly registered therein within one year prior to the expiration of the existing term."

But defendants contend that R. S. § 4954 (Copyright Act of 1870), still applies, on the ground that the provisions of the new statute are not in conflict with it. The repealing clause of the act of 1909 (section 63 [Comp. St. § 9584]) is as follows:

"All laws or parts of laws in conflict with the provisions of this act are hereby repealed."

R. S. § 4954, of the old act, reads as follows:

"Sec. 4954. The author, inventor, or designer, if he be still living and a citizen of the United States or resident therein, or his widow or children, if he be dead, shall have the same exclusive right continued for the further term of fourteen years, upon recording the title of the work or description of the article so secured a second time, and complying with all other regulations in regard to original copyrights, within six months before the expiration of the first term. And such person shall, within two months from the date of said renewal, cause a copy of the record thereof to be published in one or more newspapers, printed in the United States, for the space of four weeks."

[11] Section 24 provides that the copyrights subsisting in any work at the time when that act went into effect might be renewed and extended by persons indicating "for a further period such that the entire term shall be equal to that secured by this act, including the renewal period: * * * Provided, that application for such renewal and extension shall

be made to the Copyright Office and duly registered therein within one year prior to the expiration of the existing term." The term secured by the act of 1909 (section 23 [Comp. St. § 9544]) is 28 years from the date of the first publication, with a renewal of 28 years. Under section 24 application is to be made to the Copyright Office within one year before the copyright would otherwise end. Under section 4954 (Revision of December 1, 1873) of the Revised Statutes, a class of persons more limited than set forth in section 24 had the right to renew for a further term of 14 years, instead of 28, upon recording the title of the work; not on making application for renewal with the Librarian of Congress (R. S. § 4956); not in the Copyright Office and upon complying with all the other regulations in regard to the original copyrights within six months; not one year before the expiration of the first term.

R. S. § 4954, further provided "and such persons shall, within two months from the date of said renewal, cause a copy of the record thereof to be published in one or more newspapers, printed in the United States, for the space of four weeks." So that in the old statute a nine-month period is specified, with the Librarian of Congress acting, with no application for a renewal, while under the act of 1909 a one-year period is prescribed, with the Copyright Office acting upon the application. To further emphasize the distinction between the provisions and those of the act of 1909, R. S. § 4956, old act, after providing for the deposit of the title of the work, requires delivery of two copies of the work to the Librarian of Congress within ten days after publication, so that, if the view which the defendants urge was correct, the owner of the copyright would also be required to republish the work and deposit additional copies with the Librarian of Congress.

Then there is the further conflict between the old and new provisions, which creates an impossible situation, unless the provisions of the new act prevail, for the act of 1909 requires the application to be made in the Copyright Office, and registration to be made in the Copyright Office within a certain time, while the provisions in the Revised Statutes required that the title be recorded with the Librarian of Congress and the date of publication is within a time specified after such deposit with the Librarian of Congress. The act of 1909 having included a uniform method for all future renewals, and definitely referring to a certain part of the method for the renewal of old copyrights, Congress seems to have intended to exclude the impos-

sible provision as to the advertising of steps that were not to take place under the act of 1909, so that the reasonable interpretation is not that they intended the old provisions relating to the renewal to continue, some of which would be impossible under the act of 1909, but that the method prescribed in the act of 1909 was to be substituted in the place of the provisions under the old Revised Statutes.

While some of the conflicting provisions referred to above may be regarded as minor, it seems to me that the substance and purpose of the new act was to provide an entirely new method for the securing of extensions of all copyrights; that as the old provisions relating thereto were in conflict with the new, the old are repealed; and that requirement of publication in a newspaper was eliminated. It also seems likely that Congress had in mind the modern conditions, and realized that, while publication in a newspaper in 1870 might have been notice to the public, the publication to-day in a newspaper would accomplish but little in that respect, and would be practically useless. Moreover, what reason could Congress have for requiring the publication in a newspaper of an application for extension of copyright granted under the 1870 act, and not required it for an extension of the copyright granted under the 1909 act.

It is conceded that the Copyright Office at Washington has made all renewal registrations since the 1909 act came into effect in accordance with the 1909 act. While, of course, their interpretation is not final, the administrative interpretation of a law is entitled to great consideration. Mrs. Gunter, in renewing the copyright of the book, complied with the requirements of the Register of Copyrights and the provisions of the 1909 act, and in my judgment the renewal of the copyright was properly made, for hers was a "copyright subsisting * * * when this act goes into effect." I come to this conclusion after a full examination of the statutes and am aware that in Goldwyn Pictures Corporation v. Howells Sale Co., 282 F. 9, when the Circuit Court of Appeals for this circuit had this case under consideration, Judge Mayer stated:

"We shall not discuss defendants' contention that a renewal of the copyright of the book was not properly secured. For the purposes of this appeal we shall assume, without deciding, that plaintiff is the legal owner of the dramatic motion picture rights."

[12] Another point urged by the defendants is that, even if the novel did antedate the play, the copyright of the novel did not include the dramatic rights, and the infringement, if any, is of the dramatic rights, and not of the book. Section 4952, as amended by Act March 3, 1891, § 1 (26 Stat. 1106), struck out the words, "And authors may reserve the right to dramatize or to translate their own works," and substituted therefor the words, "And authors and their assigns shall have exclusive right to dramatize and translate any of their works for which copyrights shall have been obtained under the laws of the United States." The purpose of this amendment undoubtedly was to correct a then existing situation, resulting in an unjust loss of rights by the owner or by the author of a copyrighted book, and to protect such a one from just such a situation as now confronts these plaintiffs; and it seems quite evident that, after July 1, 1891, the right to dramatize became part of all existing copyrights in books.

It appears from a copy of the first edition of the book "Mr. Barnes of New York" that it contains the correct copyright notice reading as follows: "Copyright 1887 by A. C. Gunter. All rights reserved." The defendants have offered no evidence that other copies were published without containing the proper copyright notice. Falk v. Gast (C. C.) 40 F. 168. Moreover, defendants received actual notice of the copyright from plaintiffs on December 5, 1921, which was prior to defendants' exhibition of the moving picture.

Without going into detail, a comparison of the manuscript play "Mariana" with defendants' motion picture "Vendetta" indicates quite clearly, I think, that "Mariana" was not the source from which "Vendetta" was derived. It does not appear that Gunter's play "Mr. Barnes of New York" had fallen into the public domain, either by the filing of the manuscript play "Mariana" in the office of the Lord Chamberlain in England, by the license to Funch & Co., or by any of the methods urged by defendants.

[13] The defendants Howells Sales Company, Inc., Benjamin F. Howells, Stuart K. Kohn, Commonwealth Film Corporation, and Mitchell H. Mark Realty Corporation have moved to amend their answers. Without setting forth at length the proposed amendments, the nature of it is summarized in paragraph 18 of the proposed supplemental answer, and is as follows:

"Eighteenth. That by reason of the warranties and representations of the defendant Ben Blumenthal, made at the time of the sale of the said motion picture entitled 'Vendetta' to the defendant MacDonald, and contained in the said agreement annexed hereto and

marked Exhibit A, the defendant Ben Blumenthal is liable to these defendants for all damages sustained by them in connection with the defense of the actions brought against them by the plaintiffs herein, including this action, and also for any judgment that may be entered against these defendants in the present action, all of which damages the said defendant Ben Blumenthal should be adjudged to pay."

The proposed amendment asks that the defendant Blumenthal "be adjudged and decreed to indemnify these defendants against any and all damages which they may be compelled to pay in this action." The moving defendants urge this amendment "in the interest of justice to all the parties hereto, and for the purpose of preventing a multiplicity of litigation, inasmuch as the liabilities of all the parties as between themselves will be disposed of at one time, and further litigation as to that question made unnecessary." An examination of the proposed amendment reveals that the moving defendants seek thereby to litigate in this action the question of Blumenthal's liability for breach of an alleged warranty.

The main action herein is under the Copyright Act. The relief prayed for in the principal action, besides the usual injunction, is that each of the defendants shall account to the plaintiffs for all profits earned out of the infringement of copyright. The defendants are not being sued on a single claim on which they are jointly or primarily or secondarily liable. The defendant Blumenthal was an importer and distributor of motion pictures, and acquired the American rights from a German concern of two motion pictures, one of them being "Vendetta," and in June, 1920, transferred such rights to defendant MacDonald, who thereupon assigned his rights to the Howells Sales Company. By the contract Blumenthal warranted that he owned and controlled the American rights to this picture. The contract contains no mention of copyright.

It is claimed by Blumenthal that the sole purpose of this warranty was to insure the assignee of these rights; that Blumenthal had lawfully secured copies of the picture "Vendetta" from the producer, and had acquired from the producer the exclusive right to exhibit the picture in the United States. The obligation of Blumenthal to indemnify the moving defendants must arise by virtue of the alleged warranty contained in the agreement of sale, if any such damages they give rise to an action at law, and, until the question as to whether there has been a breach of warranty

is determined, Blumenthal cannot be held liable to them, and the present suit is an action in equity.

Rule 30 of the Equity Rules of this court, provides:

"The defendant in his answer shall in short and simple terms set out his defense to each claim asserted by the bill. * * * The answer must state in short and simple form any counterclaim arising out of the transaction which is the subject-matter of the suit, and may, without cross-bill, set out any set-off or counterclaim against the plaintiff which might be the subject of an independent suit in equity against him, and such set-off or counterclaim so set up shall have the same effect as a cross suit, so as to enable the court to pronounce a final judgment in the same suit both on the original and cross claims."

[14] This rule, however, does not warrant the interposing in an equity suit any claim related to the subject-matter of the principal suit. The limitation is that the answer may set up only such claims as are "the subject of an independent suit in equity." In the American Mills v. American Surety Co., 260 U. S. 360, 43 S. Ct. 149, 67 L. Ed. 306, Mr. Chief Justice Taft, in speaking of rule 30, states: "The rule should be liberally construed to carry out its evident purpose of shortening litigation, but the limitation of counterclaims to those which are equitable, is imperative." See, also, Motion Picture Patents Co. v. Eclair Film Co. (D. C.) 208 F. 416; Electric Boat Co. v. Lake Torpedo Co. (D. C.) 215 F. 377. The mere prayer for relief cannot control, if the substance of the cross-demand is legal relief. Hyde v. Blaxter (C. C. A.) 299 F. 167.

Although in Camp v. Boyd, 229 U. S. 630, 33 S. Ct. 785, 57 L. Ed. 1317, the Supreme Court stated "a court of equity ought to do justice completely, and not by halves. * * * One of the duties of such a court is to prevent a multiplicity of suits, and to this end a court of equity, if obliged to take cognizance of a cause for any purpose, will ordinarily retain it for all purposes, even though this requires it to determine purely legal rights that otherwise would not be within the range of its authority." Yet this was intended to be accepted with certain limitations, for constitutional rights of the parties are to be regarded, and a defendant cannot be compelled to interpose a counterclaim on purely a legal cause of action, and thus be deprived of his right to an action at law and a jury trial.

In American Surety Co. v. American Mills (C. C. A.) 273 F. 67, affirmed 260 U. S. 360, 43 S. Ct. 149, 67 L. Ed. 306, Judge Manton,

writing for the Circuit Court of Appeals, stated:

"The courts never intended, nor had they the power, to compel a defendant to plead a purely legal cause of action as a counterclaim to a suit in equity, and Rule 30 was never so intended. To do so would be in conflict with the Seventh Amendment of the federal Constitution, which provides: 'In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.'"

Therefore the motion to amend the answer must be denied. Accordingly, I find that the plaintiffs are entitled to the following relief, and may enter an order to that effect upon the usual notice: That the defendants, and their agents and representatives, be enjoined from producing or exhibiting or otherwise dealing in the said infringing moving picture "Vendetta," or any other dramatic moving picture representation of the book "Mr. Barnes of New York." That all negatives, prints, and printed matter concerning the infringing moving picture "Vendetta" be destroyed. That the defendants and each of them account under oath for all moneys received by them from the sale and exhibition of the moving picture "Vendetta," and pay to the plaintiffs such damages as may appear by an accounting to have been sustained by the plaintiffs in consequence of the unlawful exhibition or sale of said moving picture.

The individual defendants, Benjamin F. Howells and Stuart M. Kohn (now known as Stuart K. Brandon), must also be included in the decree, as they were president and secretary, respectively, of the Howells Sales Company, and took part in the actual distribution of the infringing picture after having notice from the plaintiffs, although the amount of damages which may be proved against them is another matter.