In re CAMBRIDGE BIOTECH CORPORATION, Debtor.

INSTITUT PASTEUR and Genetic Systems Corporation, Plaintiff and Counterclaim Defendants,

v.

CAMBRIDGE BIOTECH CORPORATION, Defendant and Counterclaim Plaintiff.

Bankruptcy No. 94–43054–JFQ.
Adv. No. 95–04074.

United States Bankruptcy Court, D. Massachusetts.

Sept. 1, 1995.

**12**

Jeffrey D. Sternklar, Burns & Levinson, Boston, MA, Albert Breneisen, Kenyon & Kenyon, New York City, for Institut Pasteur and Genetic Systems Corp.

Anthony L. Gray, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Cambridge Biotech Corp.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Institut Pasteur ("Pasteur") and Genetic Systems Corporation ("Genetic") bring this adversary proceeding alleging that Cambridge Biotech Corporation (the "Debtor"), a chapter 11 debtor here, is infringing three patents owned by Pasteur and licensed to Genetic. The patents cover methods for the detection of Acquired Immune Deficiency Syndrome ("AIDS"). The plaintiffs seek both injunctive and compensatory relief.

Before the court are three motions. The Debtor moves for summary judgment on all the infringement claims. Pasteur and Genetic move for summary judgment on one infringement claim. They also move to dismiss Counts I and II of the Debtor's Answer and Counterclaim. In Count I, the Debtor requests a declaratory judgment that it has an existing license from a third party encompassing two of the patents in dispute, and that this license is valid notwithstanding the exclusive license held by Genetic. In Count II, the Debtor seeks damages from Pasteur, which is a signatory to the license agreement, for breach of the license agreement. The plaintiffs contend these counts of the Answer and Counterclaim should be dismissed for failure to join the Debtor's licensor, an indispensable party. All the motions were taken under advisement after argument. Because it was apparent a decision on them would be largely dispositive of the entire case, the trial was continued generally.

The parties have engaged in some preliminary skirmishing. Immediately after filing their complaint, the plaintiffs requested the district court to withdraw the reference of this adversary proceeding. That was denied. The Debtor sought and obtained an order from this court declaring this adversary proceeding to be a core proceeding because it is in essence a claim against the Debtor's bankruptcy estate. I have also denied the plaintiffs' request for a jury trial because of the core and equitable nature of this proceeding.

The undisputed facts shall be set forth in discussion of the relevant legal issues.

### I. THE PATENTS

In 1983, scientists at Pasteur's laboratories in Paris discovered what is now know as HIV-1 (Human Immunodeficiency Virus Type 1). HIV-1 was thought to be the sole cause of AIDS, until several years later, when Pasteur's scientists discovered what is now known as HIV-2. Both HIV-1 and HIV-2 belong to a family of viruses known as retroviruses. It is likely, but not certain, that persons infected with HIV-1 or HIV-2 will acquire AIDS.

Pasteur is the owner of the following United States patents:

United States Patent 5,217,861 ("the '861 patent"), entitled "ANTIGEN OF A HUMAN RETROUIRUS [sic], NAMELY, P18 PROTEIN OF HUMAN IMMUNODEFICIENCY VIRUS (HIV), COMPOSITIONS CONTAINING THE ANTIGEN, A DIAGNOSTIC METHOD FOR DETECTING ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS) AND PRE–AIDS, AND A KIT THEREFOR," which the United States Patent and Trademark Office ("PTO") issued on June 8, 1993.

United States Patent 5,055,391 ("the '391 patent"), entitled "METHOD AND KIT OR [sic] DETECTING ANTIBODIES TO ANTIGENS OF HUMAN IMMUNODEFICIENCY VIRUS TYPE 2 (HIV–2)," which the PTO issued on October 8, 1991.

United States Patent 5,051,496 ("the '496 patent"), entitled "PEPTIDES RELATED TO HUMAN IMMUNODEFICIENCY VIRUS II (HIV–2)," which the PTO duly and legally issued on September 24, 1991.

Genetic has, through license, obtained exclusive rights in the United States under all three patents, including the right to sue for infringement. The continued validity of two of those licenses is at issue here.

## II. *EFFECT OF THE CLAIMS BAR DATE*

█ The Debtor argues it should be granted summary judgment on the plaintiffs' claim for prepetition damages because the plaintiffs have not filed proofs of claim for those damages, and the bar date of January 2, 1995 has long since passed. The plaintiffs have filed nothing designated as a proof of claim. Because the present complaint was filed on March 8, 1995, it cannot be considered a timely proof of claim. *See Northeast Office and Commercial Properties, Inc. v. Smith Valve Corp. (In re Northeast Office and Commercial Properties, Inc.)*, 178 B.R. 915 (Bankr.D.Mass.1995).

The plaintiffs contend it was unnecessary for them to file a proof of claim because they do not possess a "claim" within the meaning of the Code. The Code defines "claim" as encompassing both the right to payment and the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. 11 U.S.C. § 101(5) (1988). The plaintiffs seek damages and an injunction. As I have previously ruled, the allegations contained in the complaint give rise to a "claim" within the meaning of the Code.

█ The Debtor did not list the plaintiffs on its schedules or formally give them notice of the bar date. This does not matter. On July 15, 1994, an entity now known as Pasteur Sanofi Diagnostics filed a notice of appearance. It stated it was a creditor and requested that it be served with all papers filed in the case. As a result, by notice dated November 15, 1994, the Debtor gave it due notice of the January 2, 1995 bar date. As appears in greater detail later, Pasteur Sanofi Diagnostics is the party with whom the Debtor signed a license agreement concerning two of the patents. Pasteur Sanofi Diagnostics owns all the stock of Genetic and is in turn owned by an entity in which Pasteur holds a substantial minority interest. Both plaintiffs learned of the bar date through the notice to Pasteur Sanofi Diagnostics. Indeed, it was the lawyer representing the plaintiffs in this adversary proceeding who filed the notice of appearance on behalf of Pasteur Sanofi Diagnostics. Due knowledge of an event makes any deficiency in the manner of notice irrelevant. *See, e.g., Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 515 (5th Cir.1994). The plaintiffs do not contend otherwise.

The plaintiffs' failure to file a claim by the bar date requires disallowance of their prepetition claims. Prior to the Bankruptcy Reform Act of 1994, which does not govern this case, the Code contained no provision requiring proofs of claim to be filed by the bar date as a condition precedent to allowance. The Federal Rules of Bankruptcy Procedure, however, set times by which claimants must file their proofs of claim. In a chapter 11 case, the Rules require a proof of claim to be filed by the date the court sets. Fed. R.Bankr.P. 3003. In a chapter 7 or 13 case, the proof of claim must be filed within ninety days after the date first set for the meeting of creditors.

Opinion is divided on whether the Rules operate to bar an untimely proof of claim. The seminal case among those holding the Rules do not bar an untimely proof of claim is *In re Hausladen*, 146 B.R. 557 (Bankr. D.Minn.1992). Because the case was under chapter 13, the bar date fell 90 days after the date first set for the meeting of creditors. The court held passage of this bar date did not require disallowance of the creditor's claim. It reasoned that section 502 of the Code governing allowance of claims did not specify late filing as a ground for disallowance. The court concluded the Rules merely implied a bar date. *Id.* at 559–560. Some courts, mostly in chapter 13 cases, follow *Hausladen. See In re Sullins*, 161 B.R. 957 (Bankr.M.D.Tenn.1993); *see also State of Illinois, Department of Revenue v. Raleigh (In re Stoecker)*, 172 B.R. 579 (N.D.Ill.1994) (bar date set forth in Rules conflicts with § 726, applicable in Chapter 7 cases, which explicitly allows for untimely filed proofs of claim). However, many other courts hold a late claim is barred by virtue of the Rules so long as the claimant has adequate notice. *See, e.g., Gullatt v. United States of America (In re Gullatt)*, 169 B.R. 385 (Bankr.M.D.Tenn. 1994); *In re Schaffer*, 173 B.R. 393 (Bankr. N.D.Ill.1994); *Grubb v. Pittsburgh Nat'l Bank (In re Grubb)*, 169 B.R. 341 (Bankr. W.D.Pa.1994); *In re Chavis*, 160 B.R. 804 (Bankr.S.D.Ohio 1993); *In re Crooker*, 159 B.R. 790 (Bankr.E.D.Ky.1993); *In re Bailey*, 151 B.R. 28 (Bankr.N.D.N.Y.1993).

I agree with those courts disallowing the claim of a creditor who fails to file his claim by the bar date. That date is an important part of any bankruptcy case, as it provides both the debtor and creditors with finality. The bar dates set in the Rules would be rendered meaningless if untimeliness was not considered grounds for disallowance. *See Chavis*, 160 B.R. at 807. I also receive guidance from the Congressional reversal of *Hausladen* and its progeny. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 213, 108 Stat. 4106 (codified at 11 U.S.C. § 502(b)(9)).

Failure to file timely proofs of claim does not mean the plaintiffs have no rights against the Debtor. If they hold valid patent rights, they have infringement claims to the extent the Debtor's postpetition conduct constitutes infringement. Such conduct occurring after the petition filing date and prior to confirmation of the Debtor's plan would create an administrative expense claim entitled to first priority. *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). Infringement conduct occurring after confirmation would create a claim that is not discharged at confirmation. 11 U.S.C. § 1141(d)(1) (1988) (confirmation discharges debts that "arose before the date of confirmation"). I now turn to the validity of the patent infringement claims.

## III. *THE '391 AND '496 PATENTS*

The Debtor does not contest the validity of the '391 and '496 patents. Nor does the Debtor contend the HIV–2 Kits which it manufactures and sells do not encompass the subject matter of these two patents. The Debtor asserts, rather, that the patents are included within a cross-license agreement entered into on October 25, 1989 between the Debtor and an entity then named Diagnostic Pasteur ("DP"). Pasteur's signature, after the words "For approval", appears on the agreement, below the signature of DP. Harvard College also signed in a similar capacity, below the signature of the Debtor.

Through a license arrangement with Harvard, the Debtor then held the right to produce certain proteins associated with HIV–1, such as gp110/120 and p27 and other proteins related to HTLV–1 (Human T-Cell Leukemia Virus Type 1), such as gp61. Pasteur held patents and patent applications on proteins associated with HIV–1, such as gp110/120 and p27. Pasteur also held patent applications on technology associated with HIV–2 which were exclusively licensed to DP. To avoid conflict between the various claims, the parties executed the October 25, 1989 cross-license agreement, which is royalty-bearing.

Under the cross-license agreement, the Debtor and DP each licensed to the other its various patent rights. At that time, DP did not have the right to license rights under the '391 and '496 patents. It had already licensed the United States rights on these

patents to the co-plaintiff here, Genetic. The cross-license agreement between the Debtor and DP contains the following provision on this subject:

2.2 The license granted to CBS [the Debtor] by DP under paragraph 2.1. shall be automatically extended under the Licensed Patents as defined herein and as enclosed in Exhibit C upon recovery by DP from GENETIC SYSTEMS of the right to practice DP's letter patent included in Exhibit C, which DP shall use its best efforts to recover. DP represents that it is currently discussing such recovery with GENETIC SYSTEMS and will inform CBS with the progress and results of such discussions.

The '391 and '496 patent rights are among those included in the patent applications set forth in Exhibit C of the cross-license agreement. As stated in the quoted clause, DP was then in discussion with Genetic concerning "recovery" by GP from Genetic of rights under the '391 and '496 patents. Genetic is a United States biotech research company. DP and Genetic had previously, in 1984, entered into a joint venture and formed a corporate entity known as Blood Virus Diagnostics, Inc. ("BVD"). It was pursuant to this joint venture that DP had licensed to it the '391 and '496 patent rights.

In late 1988, DP began to renegotiate its 1984 agreement with Genetic, which was then owned by Bristol–Myers, Inc. At the time of the cross-license agreement, October 25, 1989, DP and Genetic had held no discussion of a possible acquisition of Genetic by DP or by any other party. The discussions related only to restructuring the 1984 agreement so as to revest in DP (and hence in the Debtor) rights in the two patents then licensed to Genetic. Similarly, at the time of the October 25, 1989 cross-license agreement, there had been no discussion between DP and the Debtor concerning DP acquiring ownership of Genetic rather than these license rights.

The corporate structures involving Pasteur, DP and Genetic are complex. And the names are confusing. At the time of the cross-license agreement, Pasteur owned (and still does) a minority stock interest in DP.

The majority interest in DP was and is held by Sanofi, S.A. Shortly after execution of the cross-license agreement, Sanofi learned Bristol–Myers wanted to sell Genetic. Sanofi then began discussions with Bristol–Myers for the purchase of Genetic. These discussions culminated in an agreement under which a subsidiary of Sanofi, Elf Sanofi, Inc., acquiring all the outstanding capital stock of Genetic in April of 1990. Thereafter, the stock was transferred to Kallestad Diagnostics. The latter entity is a wholly-owned subsidiary of DP. Its name has been changed to Sanofi Diagnostics Pasteur, Inc. DP, which is now called Pasteur Sanofi Diagnostics, continues to hold all the outstanding stock of Sanofi Diagnostics (formerly Kallestad Diagnostics), which in turn continues to hold all the stock of Genetic.

In summary, DP (now Pasteur Sanofi Diagnostics) owns all the stock of a corporation which in turn owns all the stock of Genetic.

When the Debtor learned of the acquisition of Genetic, it believed DP had succeeded in performing its obligation to use "its best efforts to recover" license rights for the '391 and '496 patents. The Debtor therefor forwarded royalty checks to DP (by then called "Pasteur Sanofi Diagnostics"), which declined to retain them. DP asserted the Debtor had no license rights in the patents, and reserved all rights to proceed against the Debtor.

### A. Is Pasteur an "Affiliated Company"?

The Debtor mounts several arguments. It contends, first of all, that Pasteur is jointly obligated with DP (Pasteur Sanofi Diagnostics) under the 1989 cross-license agreement because the agreement obligates not only the named parties but also a so-called "affiliated company." The agreement contains this provision concerning an affiliated company:

1.4 "Affiliated Company" shall mean an organization which controls or is controlled by a party or an organization which is under common control with a party hereto and/or an organization qualifying as above (control shall mean direct or indirect legal or beneficial ownership of 51% or more of the

voting stock). Unless the contrary is clearly indicated by the text hereof in every instance of this Agreement it is understood that reference to a party includes Affiliated Companies of such party as well. And [sic] that such party may extend to its Affiliated Companies the benefits of this Agreement so that such party shall remain responsible with regard all obligations placed upon such party by the basis of this Agreement. For the purposes of this Agreement, the parties confirm that the companies SANOFI DIAGNOSTICS and DIAGNOSTICS TRANSFUSION, two companies within the SANOFI Group, shall be deemed to be Affiliated Companies of DP, as long as their relationship remain unchanged.

Pasteur is not an "Affiliated Company." It neither controls, nor is it under common control with, DP (Pasteur Sanofi Diagnostics). Sanofi, S.A. controls DP but does not control Pasteur.

### B. Is Pasteur guilty of "action intended [to] frustrate"?

■ The Debtor also points to section 8.4 of the 1989 cross-license agreement, which reads as follows:

Institut Pasteur and the President and Fellows of Harvard College, by executing this Agreement, each hereby signifies its assent to the terms hereof and agrees to take no action intended frustrate [sic] the operation of this Agreement.

Pasteur has taken no action "intended [to] frustrate" operation of the agreement. Sanofi, S.A., which is not an affiliate of Pasteur, purchased Genetic and placed its ownership in the hands of a subsidiary of DP (Pasteur Sanofi Diagnostics). Pasteur owns only a minority interest in DP.

### C. Has there been "recovery" by DP of the patent rights?

■ The Debtor's principal argument is that DP's ownership of a corporation whose wholly-owned subsidiary owns all the stock of Genetic constitutes "recovery" by DP of Genetic's '391 and '496 patent license rights

within the meaning of the cross-license agreement, so that those rights are now "automatically" licensed to the Debtor pursuant to the terms of the agreement.

I conclude the agreement is not subject to this interpretation. There is a significant difference between ownership of patent license rights and ownership of a corporation whose wholly-owned subsidiary holds those rights. Acquisition of ownership of Genetic, furthermore, was not within the contemplation of the parties at the time they signed the cross-license agreement. The discussions then going on between Genetic and DP concerned only acquisition of license rights. It was not until Genetic went on the block for sale a few months later that a possible purchase of its capital stock came to the fore. And then it was Sanofi, S.A. rather than DP that made the purchase.

### D. Application of the Equitable Maxim—Equity Treats as Done That Which in Good Conscience Should be Done

■ The Debtor's plight is nevertheless disturbing. DP (now Pasteur Sanofi Diagnostics) obligated itself to use its "best efforts" to acquire these patent rights. It now owns all the stock of the parent of a corporation which holds the rights. Yet it has not sought to own the rights themselves. Pasteur, DP's minority stockholder, refuses in this court to do anything about the situation and insists upon the real but technical distinction between ownership of stock and ownership of patent rights. This is presumably with the consent of Sanofi, S.A., DP's majority stockholder.

■ It is inequitable for DP not to be treated as owning the rights. There is an old maxim in equity. Equity treats as done that which in good conscience should be done. *E.g., Independent Wireless Telegraph Co. v. Radio Corp. of America,* 269 U.S. 459, 473, 46 S.Ct. 166, 171, 70 L.Ed. 357 (1926); *Camp v. Boyd,* 229 U.S. 530, 559, 33 S.Ct. 785, 796, 57 L.Ed. 1317 (1912); *Baseball Pub. Co. v. Bruton,* 302 Mass. 54, 18 N.E.2d 362, 365 (Mass.1938); John North Pomroy, *Equity Jurisprudence* 364 (5th ed. 1941); George

L. Clark, *Equity* § 20 (1954); Joseph Story, *Equity Jurisprudence* § 81 (14th ed. 1918).

*Independent Wireless Telegraph* was also a patent infringement case. An exclusive licensee had brought suit in its name, not the name of the patent owner. Because the suit was a general equity action, it did not fall within the scope of a statute permitting a licensee to sue in its own right. The licensee was unable to join the patent owner because the latter was outside the trial court's jurisdiction. The patent owner declined to authorize suit in its name, even though it was obligated to do so. The Supreme Court approved the licensee's use of the patent owner's name as co-plaintiff, resting its decision on the maxim that equity regards as done that which should be done.

One of the earliest decisions to employ the maxim is the 1721 decision of the English Chancellor in *Frederick v. Frederick*, 1 P.Wms. 711. The case concerned a prenuptial agreement. The groom-to-be, heir apparent of a wealthy former lord mayor of London, promised to become a citizen of London. He made the promise in order to give his wife, at his death, the benefit of the probate laws of London, which treated surviving widows better than did the laws elsewhere in England. The parties married, had five children, and the husband died without becoming a citizen of London, leaving the widow only ten pounds. As a result, under the statute, the widow was not entitled to the one-third estate share she would receive had her husband kept his promise. The Chancellor considered the widow's plight to be highly inequitable. He treated the decedent as a citizen of London, and awarded the widow a one-third share of the estate.

 Bankruptcy courts are essentially courts of equity, governed by equitable principles. *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); *Securities & Exch. Comm'n v. United States Realty & Imp. Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940); *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *Continental Ill. Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 675, 55 S.Ct. 595, 605–06, 79 L.Ed. 1110 (1935); *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). They have used their equitable powers to resolve a wide variety of issues before them. These powers "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper*, 308 U.S. at 304–05, 60 S.Ct. at 244.

Treating these patent rights to be outside the Debtor's license would be inequitable. It is obviously a simple matter for DP (Pasteur Sanofi Diagnostics) to obtain the rights through its wholly-owned subsidiary which in turn owns Genetic. Yet it has failed to do so, clearly breaching its best efforts obligation. That DP should perhaps pay consideration for the transfer is immaterial. Its "best efforts" obligation under the cross-license agreement obviously assumes consideration may have to be paid to Genetic, which was not then a controlled entity.

### E. Is DP (Pasteur Sanofi Diagnostics) an indispensable party to this proceeding?

 The plaintiffs move to dismiss Counts I and II of the Debtor's Answer and Counterclaim, which rely upon the cross-license agreement. The plaintiffs contend the court cannot adjudicate these counts because DP (Pasteur Sanofi Diagnostics), the other party to that cross-license agreement, is an indispensable party to the adjudication. As discussed in part II, DP has filed an appearance in the Debtor's bankruptcy estate. But it is not a party to the present adversary proceeding. Pasteur, which holds a minority interest in DP, is a party in its capacity as owner of the licensed patent rights.

Although kept a secret in the plaintiffs' brief, Rule 19 of the Federal Rules of Civil Procedure governs. Rule 19 provides:

(a) **Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among

those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

**(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extend a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**(c) Pleading Reasons for Nonjoinder.** A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)–(2) hereof who are not joined, and the reasons why they are not joined.

**(d) Exception of Class Actions.** This rule is subject to the provisions of Rule 23.

■ The rule requires a two-step analysis: first, whether a person should be joined, and second, if the person should be joined

but it is not feasible to do so, whether equitable considerations indicate the case should go forward in his absence. *Provident Tradesmens Bank & Trust Co., Adm'r v. Patterson, Adm'r,* 390 U.S. 102, 108–09, 88 S.Ct. 733, 737–38, 19 L.Ed.2d 936 (1968); *Pujol v. Shearson/American Express, Inc.,* 877 F.2d 132, 134 (1st Cir.1989).

My ruling on the license rights, vesting them in the Debtor, is grounded on DP's breach of its "best efforts" obligation under its 1989 cross-license agreement with the Debtor. This does not affect DP's ownership of the rights. It did not own them before the ruling and does not own them thereafter.

Arguably, however, the nonjoinder of DP is prejudicial to Genetic. As a result of my ruling today, Genetic may have a claim against DP for the value of the license rights taken from Genetic. In the prosecution of that claim, DP as a nonparty would obviously not be bound by today's ruling. Thus in theory DP could convince a court it had used its best efforts to acquire the license rights, leaving Genetic with neither the rights nor compensation for their loss.

Does this mean that without DP as a party Genetic is "subject to substantial risk of incurring ... inconsistent obligations" within the meaning of subparagraph (a) of the Rule? I think not. Genetic, bear in mind, is the wholly-owned subsidiary of a corporation which in turn is wholly-owned by DP. The prosecution of a claim by Genetic against DP is not a practical possibility.

Presumably, had DP used its best efforts to get the license rights from Genetic, it would have done so by simply having them pass as a dividend from Genetic to Sanofi Diagnostics Pasteur, Inc. to DP. Thus Genetic would have lost the rights without compensation, which is exactly the effect of my ruling vesting the rights in the Debtor. Genetic is therefor not prejudiced. Genetic does not argue to the contrary; it deals only in platitudes to the effect that both parties to a contract should take part in adjudication of rights thereunder.

■ There is reason not to require the joinder of DP even if DP is a proper party pursuant to paragraph (a) of the Rule. The

1989 cross-license agreement requires any suit against DP to be brought in France. Thus DP cannot be made a party here without its consent. It is therefor not "feasible" to join DP.

 This brings paragraph (b) of the Rule into play. A court should take a pragmatic approach in considering equities pursuant to paragraph (b). *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. at 106–07, 88 S.Ct. at 736–37; *Pujol v. Shearson/American Express, Inc.*, 877 F.2d at 134. With this in mind, I conclude that the equities favor proceeding without DP.

 The first factor set forth in paragraph (b) concerns prejudice. As discussed, there is no prejudice to DP from its nonjoinder. DP has no claim to ownership of the rights. The rights belong either to Genetic or the Debtor. Nor, as discussed, is there prejudice to Genetic. DP's proper performance of its "best efforts" obligation would likely be accomplished by means of DP requiring Genetic to distribute the rights as a dividend, with Genetic receiving no compensation for them. And, even if DP would make payment to Genetic, DP as Genetic's parent (once removed) would obviously control the amount of that compensation. There is little likelihood, furthermore, Genetic would sue DP for the compensation. A subsidiary does not sue its parent. The unlikelihood of a law suit involving the absent party is a factor favoring nonjoinder. 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 1602, 1604 (2d Ed.1986).

The other three factors specified in paragraph (b) also favor the Debtor. Because of the absence of prejudice, there is no need to shape the judgment to lessen prejudice to DP or Genetic. Today's judgment declaring the rights owned by the Debtor gives the Debtor adequate relief. Finally, the Debtor will not have an adequate remedy if Counts I and II of its answer and counterclaim are dismissed. Pursuant to the 1989 cross-license agreement, the Debtor would have to sue DP in France. And it presumably could not obtain jurisdiction in that suit over Genetic, a corporation doing business in this country. Moreover, any future legal proceeding would take time. The Debtor is in the process of reorganizing in chapter 11. It wants to sell these rights (and other related properties) as part of its reorganization. It needs to do so quickly if the sale is to aid in the reorganization. It cannot languish here long attempting to reorganize.

Rule 19(b) does not limit the permissible equitable considerations to the four specified factors. There are others present here, and they also favor the Debtor. DP could easily become a party to this law suit and thereby eliminate all arguments there is prejudice to either it or Genetic from its absence. As previously mentioned, DP filed an appearance in the main bankruptcy case, and it did so through the same lawyer representing the plaintiffs in this adversary proceeding. It is somewhat disingenuous, moreover, for the plaintiffs to protest DP's absence. Pasteur owns a substantial minority interest in DP. Genetic is its once-removed subsidiary. They presumably exert some influence on DP to join in as a party. And, they adequately represent DP's interest.

Finally, I have in mind it is not the Debtor who is responsible for this nonjoinder. The plaintiffs knew that the Debtor's defense to infringement claims concerning the '391 and '496 patents would be based on the terms of the Debtor's 1989 cross-license agreement with DP. Yet in bringing suit the plaintiffs chose not to have DP join the action. They did this even though Pasteur had granted DP an exclusive license under the patents. For all that appears, DP could just as well have been a co-plaintiff instead of Pasteur. The plaintiffs, therefor, have created the problem of nonjoinder, not the Debtor.

For all these reasons, DP is neither a proper party under Rule 19(a) nor an indispensable party under Rule 19(b).

## IV. *THE '861 PATENT*

### A. *Do the Debtor's Activities Infringe on the '861 Patent?*

The '861 patent relates to the use of certain molecules which are in a class of biological compounds known as proteins. These

molecules include the protein now known as p18. Along with other proteins, p18 is useful in testing for HIV–1 and, ultimately, AIDS. HIV–1 (and HIV–2) belong to a family of viruses known as retroviruses. Antibodies are a type of protein which the body produces to defend against foreign substances known as antigens. Antibodies form complexes with antigens and target the latter for destruction and removal from the body.

Only four claims of the '861 patent are at issue. The first three claims are so-called "method" claims. Claim 1 of the '861 patent recites:

> An in vitro diagnostic method for the detection of the presence or absence of antibodies which bind to antigens of human retrovirus indicative of Acquired Immune Deficiency Syndrome (AIDS) or of Lymphadenopathy Associated Syndrome (LAS), which method comprises contacting isolated p18 protein of said retrovirus with a biological fluid for a time and under conditions sufficient for the protein and antibodies in the biological fluid to form a complex; and detecting the formation of the complex.

Claim 2, which refers to and includes all the elements in Claim 1, claims the following:

> The method as claimed in claim 1, wherein the detecting step further comprises measuring the formation of said complex.

Claim 3, which also includes the elements recited in Claim 1, claims:

> The method as claimed in claim 1, wherein the biological fluid is human serum.

Finally, Claim 4 of the '861 patent is a product claim directed to the isolated p18 protein. It claims:

> Structural protein of Human Immunodeficiency Virus (HIV), which is p18 protein of said virus, and said protein is in isolated form.

The Debtor's HIV–1 Western Blot Kit is designed to detect, in a biological fluid, the presence or absence of antibodies to HIV–1, including the isolated p18 protein. The insert to its kit states that the kit is an "assay for the detection and identification of antibodies to Human Immunodeficiency Virus Type 1 (HIV–1), contained in human serum or plasma."

The Debtor's kit also states:

If antibodies to any of the major HIV–1 antigens are present in the specimen in sufficient concentration, bands corresponding to the position of one or more of the following HIV–1 proteins (p) or glycoproteins (gp) will be seen on the nitrocellulose strip: "p17" ... (number refers to apparent molecular weight in kilodaltons).

The parties stipulate that the "p17" referred to in the Debtor's kit is the same protein as "p18" referred to in the '861 patent. That is not, however, determinative of the controversy. The claims have to be addressed in separate categories.

### Claim 1 to 3

The Debtor observes that the method claimed in Claim 1 is described as one which is "indicative of Acquired Immune Deficiency Syndrome (AIDS)...." According to the affidavit of Jorge A. Goldstein, the presence of p18 is not indicative of the presence of either AIDS or HIV–1. Other proteins must also be taken into account, namely: p24, gp31, gp41, p51, p55, p66, gp120 and gp160 (the numbers refer to the apparent molecular weight in Kilodaltons). Only if a person meets the definition of AIDS established by the Center for Disease Control ("CDC") can a positive diagnosis of AIDS be made. Under the CDC criteria, it is appropriate to diagnose an individual as HIV–1 positive only when the test displays any two or more of p24, gp41 or gp120/160. The Debtor follows the CDC criteria in its instructions for the kit. It therefor argues its use is not the method described in Claim 1 because determining the presence of p18 through use of its kit is not indicative of the presence of HIV–1 or AIDS.

This argument elides critical wording in claim 1 as well as the technical significance of p18. Claim 1 describes a method for detecting the "presence or absence" of antibodies which bind to antigens that are "indicative" of AIDS. Obviously, the presence and absence of such binding antibodies cannot *both* indicate an individual has AIDS. The described method is therefore open to the interpretation it is helpful in determining the absence of AIDS.

This literal reading of the claim is consistent with p18's real significance. P18 is most

significant in its absence rather than presence. According to the CDC: "[A] negative interpretation requires the absence of all bands. Any other pattern not meeting the positive criteria is considered to be indeterminate." In other words, in order for an individual to test negative for HIV–1, the test must not disclose the presence of p18. If it is present, the test result, according to the CDC, is merely "indeterminate." Thus the absence of p18, together with the absence of the other antibodies discussed above, is "indicative" the individual does not have HIV–1 or AIDS.

It makes no sense to read Claim 1 in a vacuum, without the benefit of this scientific data. The data explains why p18 is present in the Debtor's Kit and is described in the FDA-approved package insert in the Kit. Claim 1, moreover, is careful to refer to the presence or absence of "antibodies," describing them in the plural.

Claims 2 and 3 are merely add-ons to Claim 1. Claim 2 involves measurement of the complex described in Claim 1. Claim 3 involves use of human serum as the biological fluid described in Claim 1.

Claim 4 is a "product" claim, not a method claim. It claims the p18 protein itself. The Debtor admits it uses the p18 protein in its kit. That use is infringement unless the patent is invalid for any of the reasons asserted by the Debtor. I now turn to its arguments of invalidity.

### B. The Debtor's Asserted Defenses to the Infringement Charges

#### 1. Lack of Enablement

Section 112 of Title 35 provides in part: The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art of which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. 112 (1988).

■ The Debtor contends the methods described in Claims 1 through 3 do not meet this statutory standard. It relies upon the affidavit of Jorge A. Goldstein. That affidavit, however, consists essentially of assertions that the claims are to a method for detecting the *presence* of AIDS, the same point discussed above. As discussed, the claims' description must be read in light of available scientific data, including the CDC criteria. When so read, the description is sufficient "to enable any person skilled in the art ... to make and use the same," within the meaning of the statute. *Compare Hormone Research Foundation v. Genentech, Inc.*, 904 F.2d 1558 (Fed.Cir.1990), *dismissed, Genentech, Inc. v. Hormone Research Foundation*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991).

#### 2. Lack of Utility

■ The Debtor also argues Claims 1 through 3 lack utility, that is, that they do not describe a "useful process" within the meaning of section 101 of Title 35. Here again its argument is the same—that the described method does not establish the presence of AIDS. As discussed, however, the claims are useful in establishing a person does not have AIDS.

#### 3. Obviousness

■ An invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103 (1988). The '861 patent was first applied for in the mid–1980's. At that time, there was virtually no prior art concerning HIV–1. The Debtor's supporting documents totally fail to sustain its burden here as well. *See, e.g., American Hoist & Derrick Co. v. Sowa & Son's, Inc.*, 725 F.2d 1350 (Fed.Cir.1984), *cert. denied, Sowa & Sons, Inc. v. American Hoist & Derrick Co.*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (placing burden on party attacking patent's validity on grounds of obviousness).

#### C. Anticipation of Product Claim of Claim 4

■ Section 102(b) of Title 35 denies patentability if—

the invention was patented or described in a printed publication in this or a foreign county or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, ...

35 U.S.C. 102(b) (1988).

The Debtor emphasizes that in making its product claim to p18 in Claim 4, p18 is described as "in isolated form." The Debtor argues this means a "band" or "gel", rather than any "purification" of the p18 protein. It says that certain publications depicting the p18 band appeared over a year before the first application filed for this patent.

The Debtor has not pleaded this defense in its answer. It did not even argue the point in the memorandum filed with its motion for summary judgment. The Debtor raised it for the first time in its opposition to the plaintiffs' motion. Nor has the Debtor requested leave of court to amend the answer. The defense is therefor not available.

A separate judgment has issued consistent with the foregoing.

### *JUDGMENT*

The Plaintiffs move for summary judgment on Count I of their complaint. They also move to dismiss Counts I and II of the Defendant's Answer and Counterclaim. The Defendant, in turn, moves for summary judgment on all counts of the complaint and all counts of its Answer and Counterclaim. The court having today issued a separate opinion containing its conclusions of law on all the motions, it is hereby

ORDERED and ADJUDGED as follows:

1. Counts II and III of the complaint are dismissed in their entirety, with prejudice.
2. The complaint is dismissed, with prejudice, as to all claims under Count I arising by reason of actions of the Defendant occurring prior to the July 7, 1994 filing of the Defendant's chapter 11 petition with this court.
3. The following United States patents are hereby declared to be "Licensed Patents," as that term is defined under the Cross–License Agreement of October 25, 1989 between the Defendant and Diagnostics Pasteur (now known as Pasteur Sanofi Diagnostics): United States patent No. 5,055,391 and United States Patent No. 5,051,496.
4. The Defendant's manufacture, sale or use, occurring after the filing of its chapter 11 petition on July 7, 1994, of so-called "HIV–1 Western Blot Kits" is declared an infringement of the Plaintiffs' rights under United States Patent No. 5,217,861. The Defendant is hereby enjoined, during the life of said patent, from manufacturing, selling or using HIV–1 Western Blot Kits, or otherwise infringing said patent.
5. The court shall conduct a pretrial on 9–18, 1995 at 9:30 A.M. concerning unresolved matters, principally the Plaintiffs' damage claims for postpetition infringement of the '861 patent.

At Worcester, this 1st day of September, 1995.